710 So.2d 543 (1998)
Daniel Eugene REMETA, Appellant,
v.
STATE of Florida, Appellee.
No. 92670.
Supreme Court of Florida.
March 29, 1998.
Peter Kenny, Capital Collateral Regional Counsel, Southern Region, and Todd G. Scher, Chief Assistant Capital Collateral Regional Counsel, Southern Region, Miami, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush and Kenneth S. Nunnelley, Assistant Attorneys General, Daytona Beach, for Appellee.
PER CURIAM.
Daniel Eugene Remeta, who is scheduled to be electrocuted on March 31,1998, appeals an order entered by the trial court below denying Remeta's Florida Rule of Criminal Procedure 3.850 motion to vacate his judgment and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), (7), Fla. Const. This is the fourth time Remeta has filed for relief in this case before this Court. For the reasons expressed, we affirm the denial of relief.
A summary of the facts and procedural history of this case is as follows. On February 8, 1985, an Ocala, Florida, convenience store clerk was murdered after being shot four times. Two days later, in Waskom, Texas, Remeta and a companion robbed a convenience store and shot the cashier five *544 times; the cashier survived the shooting. The gun used in that crime was the same gun used to fire the shots in the Ocala murder, and Remeta was identified by the Texas convenience store clerk as the individual who shot her. On February 13, 1985, a Kansas gas station attendant was shot and killed with that same gun. Shortly after the Kansas murder, a sheriff stopped Remeta's vehicle. One of Remeta's companions shot the sheriff twice. Remeta and his companions fled; they went to a grain elevator, where they abducted two men and took their truck. The two men were forced to lie face down in the roadway and each was shot in the back of the head and killed with the same gun used in the other murders. Authorities later chased the truck to a farmyard, where a shootout occurred and one of Remeta's companions was killed.
On May 13,1985, Remeta pleaded guilty in Thomas County, Kansas to the grain elevator employee kidnapping and murders, two counts of aggravated battery, and one count of aggravated battery against a law enforcement officer. On May 16, 1985, Remeta also pleaded guilty in Gove County, Kansas to first-degree murder and aggravated robbery for the Kansas gas station attendant murder and robbery. For these convictions, Remeta received four consecutive life sentences with no eligibility for parole for eighty-five years.
Thereafter, Remeta was extradited to Florida to stand trial for the Ocala murder. The Texas clerk who survived the five gunshot wounds testified against Remeta at trial. Additionally, statements made by Remeta to law enforcement officers and a newspaper reporter implicating him in the Florida murder were introduced. He was convicted of first-degree murder. After the jury unanimously recommended death, the trial judge sentenced him to death finding four aggravating circumstances (nine prior violent felonies; committed during course of robbery; committed to avoid arrest; and cold, calculated, and premeditated (CCP)) and four mitigating circumstances (mental age of approximately 13; deprived childhood; low-average intelligence and subject to discrimination because of partial American Indian heritage and speech impediment; and long term substance abuser). That conviction and sentence was affirmed by this Court in Remeta v. State, 522 So.2d 825 (Fla.1988) (Remeta I),[1] and the United States Supreme Court denied certiorari on that case on October 3, 1988. See Remeta v. Florida, 488 U.S. 871, 109 S.Ct. 182,102 L.Ed.2d 151 (1988).
On January 10, 1990, the Governor of Florida signed a death warrant on Remeta. Subsequently, Remeta filed a rule 3.850 motion for postconviction relief in the trial court and filed a petition for writ of habeas corpus in this Court. The trial court stayed the execution and set an evidentiary hearing on the rule 3.850 motion claim of ineffective assistance of counsel, finding all other claims to be without merit or to be procedurally barred. After the evidentiary hearing, the trial court denied rule 3.850 relief. This Court affirmed that ruling and denied Remeta's habeas petition in Remeta v. Dugger, 622 So.2d 452 (Fla.1993) (Remeta II).[2]
*545 Remeta next filed a petition for writ of habeas corpus in the federal district court, which was denied in 1994. That decision was affirmed by the Eleventh Circuit Court of Appeals in May 1996. See Remeta v. Singletary, 85 F.3d 513 (11th Cir.1996).[3] Letters in the record written by Remeta stated that "If I don't try for the death penalty I'll die in some prison, [t]his is why I'm trying to get extradited."; and "I'm gonna try for the death penalty if I can." Remeta also told a psychiatrist that he hoped to be transferred to a state where he would receive the death penalty. Thereafter, Remeta explicitly waived extradition. Remeta's motion for rehearing on that petition was denied, en banc, by the Eleventh Circuit in August 1996. Certiorari was denied by the United States Supreme Court in March 1997. See Remeta v. Singletary, ___ U.S. ___, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997). The Governor of Florida signed Remeta's second death warrant on December 9, 1997, scheduling his execution for March 31, 1998.
In February 1998, Remeta was allowed to intervene in a section 1983 civil action that was pending in the federal district court, in which a number of defendants represented by the Capital Collateral Regional Counsels (CCRC) were seeking to have the electric chair declared to be an unconstitutional method of punishment. However, on February 20, 1998, the district court judge reversed his decision allowing Remeta to intervene in that action, and on that same date, the judge issued summary judgment in favor of the State in that action. The Eleventh Circuit has subsequently affirmed denial of relief in that case. See Jones v. Crosby, 137 F.3d 1279 (11th Cir. 1998).
On February 18, 1998, Remeta's counsel moved to withdraw in this case due to an alleged conflict of interest caused by questions from members of the Commission for the Administration of Justice in Capital Cases regarding Remeta's involvement in the section 1983 action. The trial court denied that motion and the denial was subsequently affirmed by this Court. See Remeta v. Florida, 707 So.2d 719 (Fla. 1998) (Remeta III).
On March 24, 1998, Remeta filed his third postconviction relief request, again asking the trial court, under rule 3.850, to vacate his judgment and sentence. In that motion, *546 he raised three claims, asserting that (1) judicial electrocution is cruel and/or unusual punishment; (2) he is being denied effective representation due to CCRC-South's lack of adequate funding; and (3) invalid prior convictions in Kansas were unconstitutionally introduced into evidence in Remeta's guilt phase and were unconstitutionally used in aggravation in Remeta's penalty phase. On March 25, 1998, the trial court held a Huff[4] hearing to determine whether an evidentiary hearing was required on any of these claims. On March 27, 1998, the trial court summarily denied Remeta's claims, finding them to be procedurally barred because (1) the claims were previously raised in Remeta's prior rule 3.850 motion; (2) through the exercise of due diligence, the claims could have or should have been raised in Remeta's prior rule 3.850 motion; and (3) this Court had already decided the issues contrary to Remeta's position. This appeal ensued, and Remeta raises the same issues before this Court as those raised in the rule 3.850 motion before the trial court.
In his first claim, Remeta claims that electrocution violates the Florida Constitution's prohibitions under article I, section 17, on punishments that are either cruel or unusual. He also claims that the manner in which the State proposes to carry out his execution violates the cruel and unusual punishment provisions of both the Florida Constitution and the Eighth and Fourteenth Amendments to the United States Constitution. We find, as we recently have in other cases, that the motion, files, and record conclusively show that Remeta is entitled to no relief on this claim. See Jones v. State, 701 So.2d 76 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998). See also Buenoano v. State, No. 92,622, ___ So.2d ___ (Fla. Mar. 24,1998) (order).
In his second claim, Remeta argues that he is being denied his right to effective representation by the lack of funding available to fully investigate and prepare his postconviction pleading in this case. According to Remeta, a stay of his execution is required because CCRC-South is without funds to adequately investigate new leads that have developed in his case. He contends that he has received ten boxes of materials from the State Attorney's Office and has received materials from Kansas, which reflect that two of Remeta's accomplices were retried in Kansas and were acquitted; that other witnesses exist that have information about a deceased accomplice; and that gun residue tests were performed on the deceased accomplice, which have disappeared and which would implicate the deceased accomplice as the shooter in the Florida murder rather than Remeta. Remeta states that, without funds to hire forensic crime scene experts, he cannot determine the significance of the disclosed material. He also asserts that he needs funds to hire an expert in fetal alcohol syndrome and a false confession expert to review the materials in this case. He contends the failure to adequately fund CCRC-South to investigate these claims violates his right to effective postconviction relief counsel.
We find this claim to be without merit. First, even if adequate funding is not currently available to CCRC-South, that office has made no showing as to why the discovery of this information was not available through due diligence either at the time of trial or within the time limits set forth in rule 3.850. See Mills v. State, 684 So.2d 801 (Fla.1996). As the procedural history outlined above establishes, Remeta had ample opportunity to investigate and raise claims in earlier petitions. See Buenoano v. State, 708 So.2d 941 (Fla. 1998). The public records materials could have been obtained and investigated many years ago; instead, Remeta waited until the "eleventh hour" to attempt to investigate the issues raised in this claim. Remeta has provided no basis for why the information he now seeks to investigate "could not have been ascertained by the exercise of due diligence."
Second, even were he able to overcome the due diligence element, he has failed to establish that the material he hopes to investigate would in any way result in an acquittal on retrial. Any "newly discovered evidence" must be of such a nature that it would probably produce an acquittal on retrial. Stano v. State, 708 So.2d 271, slip op. at *547 3 (Fla. 1998); Jones v. State, 591 So.2d 911, 915 (Fla.1991). The facts of this case were set forth in detail in our opinion on direct appeal as follows.
Remeta had been involved in a series of murders and robberies throughout three states during a two week period in early 1985. On February 8,1985, the clerk of an Ocala, Florida, convenience store was murdered during a robbery. An autopsy of the victim revealed four gunshot wounds: one to the stomach, one to the upper chest, and two to the head, all made by a .357 Magnum gun. The appellant, Daniel Remeta, was later extradited to Florida in response to an indictment charging him with the murder.
Two days after the Ocala murder, on February 10, 1985, Remeta and one companion entered a convenience store in Waskom, Texas, where they robbed the cashier, Camillia Carroll, at gunpoint, abducted her to a location two to three hundred feet from the store and shot her five times with the .357 Magnum used in the Ocala shooting. Miraculously, Carroll lived and testified to the events of that day at Remeta's trial in Florida. At the time of the Florida trial, Remeta had not been convicted of the crimes against Carroll.
On February 13, 1985, the manager of a Stuckey's gas station located along Interstate Highway 70 in Kansas was shot and killed with the same .357 Magnum gun used in the Ocala murder. Shortly thereafter, a Kansas sheriff following Remeta's car on the highway noticed suspicious activity and signaled for him to pull over. When he approached, one of Remeta's companions exited the passenger side of the car and shot the sheriff twice.
Remeta and his companions fled the scene and went to a grain elevator, where they abducted two men and took their truck. Shortly thereafter, the men were made to lie face down in the roadway and each was shot in the back of the head and killed with the same .357 magnum gun. The truck was later chased into a farmyard by Kansas authorities and a shootout occurred, in which one of Remeta's companions was killed and the other injured. Remeta pled guilty to charges of homicide and aggravated robbery against the Stuckey's store clerk and received two consecutive life sentences. Remeta also pled guilty to the killings of the grain elevator employees and received two consecutive life sentences with no eligibility for parole for eighty-five years.
....
Carroll testified that on February 10, 1985, after Remeta and his friend had robbed the convenience store where she was working, they kidnapped her and drove her to a location two to three hundred feet away and shot her five times.... The state presented a stipulation of fact that one of the bullets recovered from Carroll's body was fired by the gun which had killed the Ocala convenience store clerk two days earlier and which was found three days later in close proximity to Remeta.
In its case-in-chief, the state also presented several statements made by Remeta which the trial court found to have been freely and voluntarily made. A Kansas Bureau of Investigation agent had interviewed Remeta at Remeta's request and related that Remeta admitted involvement in both of the convenience store clerks' shootings, but implicated his deceased companion as the triggerman in both incidents. Remeta was also interviewed at his request by a newspaper reporter. Remeta told the reporter that he and his friends had robbed the Ocala convenience store because they needed money, and that he was the only one who had planned the robbery. Remeta also admitted sole possession of the .357 magnum revolver at the time of the Ocala murder. Remeta offered several alternative explanations for killing the victim, including that he "just liked to kill people" and that he "just didn't care." In a different interview with a television reporter, Remeta made a general comment on his intent to eliminate witnesses by stating, "[L]ike Florida, they ain't got no witnesses. Anytime I seen a witness, I took him out, or at least shot him."
In an interview with a member of the state attorney's office, Remeta first stated *548 that he had committed the Ocala murder, but, at a later point, changed his story to implicate his companion as the triggerman. There was also presented videotaped portions of Remeta's testimony in other court proceedings, in which he stated he had possession of the gun used in the Ocala murder while in Kansas. Carroll had testified it was Remeta who had the gun at the Texas convenience store robbery. Remeta, as part of his theory of defense, attempted to establish that it was his accomplice who had possession of the murder weapon and was the triggerman in the Ocala murder. Remeta was found guilty by the jury of first-degree murder for the Ocala robbery.
Remeta I, 522 So.2d at 826-27. As the evidence at trial reflected, the convenience store clerk in Texas identified Remeta as the person who shot her; the physical evidence established that the same gun used to shoot the convenience store clerk in Texas was the same gun used in the murder at issue; the gun was recovered near Remeta at the Kansas shootout; and Remeta's own statements implicated him in the instant murder (he planned the robbery, he had possession of the gun, and he shot the victim because he "just liked to kill people."). Having considered this evidence in the context of the entire record, we agree that nothing Remeta has set forth in his rule 3.850 motion is of such a nature that it would probably produce an acquittal on retrial. Consequently, we affirm the trial judge's rejection of this claim.
Finally, Remeta argues that he must be afforded postconviction relief because his convictions in Kansas are invalid and were therefore improperly introduced into evidence in both his guilt and penalty phase proceedings. This claim is premised on the following information. As noted earlier, in 1985 he pleaded guilty in Thomas County, Kansas to two counts of first-degree murder, two counts of aggravated kidnapping, one count of aggravated battery against a law enforcement officer and two counts of aggravated battery. The State introduced some of the facts underlying those convictions in Remeta's guilt phase proceeding to establish that Remeta had possession of the murder weapon, and it relied on those convictions to establish numerous prior violent felonies in aggravation. Remeta claims that those convictions are invalid and that their introduction at his trial thus violated his Eighth Amendment rights as well as deprived him of the right to a fair trial. He claims that the convictions are invalid because he is innocent and that his guilty pleas were involuntary. He states that, in April 1997 (twelve years after he pleaded guilty to the Thomas County, Kansas charges), he filed a motion for relief in the Thomas County, Kansas trial court contesting the 1985 Kansas convictions; that the trial court denied his motion; and that he appealed that denial to the Kansas Court of Appeals, which has yet to rule on his appeal. He further states that, because he is scheduled for execution in Florida and the Kansas Court of Appeals has not ruled on his appeal, his execution must be stayed to allow him to contest the claims in Kansas. He filed a federal habeas corpus petition in the federal district court in Kansas asking that court to grant such relief. The federal district court issued a stay on March 25, 1998. Both the Attorney General of Kansas and the Attorney General of Florida appealed that action before the Tenth Circuit Court of Appeals. On March 26, 1998, the Court of Appeals summarily dissolved the stay and directed that Remeta "must seek whatever relief may be available in the state or federal courts in Florida." Remeta v. Stovall, No. 98-3081 (10th Cir.1998) (unpublished order).
We have previously determined that a defendant is not entitled to relief simply because the defendant is seeking collateral review of a conviction used to establish the aggravating circumstance of prior violent felony. Roberts v. State, 678 So.2d 1232 (Fla. 1996); Eutzy v. State, 541 So.2d 1143 (Fla. 1989). To hold otherwise would undermine the concept of finality by providing defendants with the opportunity to forever contest judgments and sentences by filing for collateral relief, no matter how nonmeritorious, on other convictions. This logic applies equally to claims regarding facts underlying other convictions used as Williams rule evidence or as relevant evidence in the guilt phase as it does to claims regarding convictions used to establish the aggravating circumstance of *549 prior violent felony. Moreover, the actual convictions in the Kansas case were not introduced in Remeta's guilt phase proceeding; only facts underlying those convictions necessary to show Remeta was in possession of the murder weapon used in the Florida murder and to connect Remeta to the Florida crimes were introduced by the State. Additionally, as noted previously, only seven of the nine prior violent felonies found in aggravation involved the Thomas County, Kansas convictions. The two prior violent felony convictions of first-degree murder and aggravated robbery in Gove County, Kansas are not at issue in the Kansas Court of Appeals proceeding. Consequently, even if the Thomas County convictions were overturned, the aggravating factor of prior violent felony would still be supported by the Gove County convictions. We conclude that Remeta is entitled to no relief on this claim.
Accordingly, for the reasons expressed, we affirm the trial court's denial of Remeta's motion to vacate his judgment and sentence of death. It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING, WELLS and PARIENTE, JJ., concur.
ANSTEAD, J., concurs in result only.
NO MOTION FOR REHEARING WILL BE ALLOWED.
NOTES
[1] In his direct appeal, Remeta raised eight issues, asserting that (1) the trial court erred in failing to obtain a knowing, voluntary, and intelligent waiver of Remeta's right to testify at trial; (2) the jury should not have been permitted to hear witnesses testify about offenses committed in Texas and Kansas; (3) the trial court erred in failing to obtain an express waiver from Remeta for his absence during the general qualification of the jury; (4) the trial court failed to make suitable inquiry in obtaining Remeta's waiver to be absent during his mother's testimony; (5) the trial court erred in finding that the murder was committed to avoid arrest; (6) the trial court erred in finding the murder to be CCP and in giving jury instructions on the aggravators; (7) the trial court erred in imposing court costs rather than community service; and (8) the death penalty statute is unconstitutional. All of these claims were found to be without merit.
[2] In his habeas corpus petition and rule 3.850 motion, Remeta raised sixteen claims, asserting that (1) his penalty phase counsel was ineffective; (2) his trial and penalty phase counsel were ineffective for failing to present a voluntary intoxication defense; (3) he was not afforded a full and fair evidentiary hearing; (4) his Kansas City counsel was ineffective in allowing him to make incriminating statements; (5) he was being illegally detained in Florida; (6) certain evidence was improperly admitted at trial as Williams rule evidence (See Williams v. State, 110 So.2d 654 (Fla.1959)); (7) certain photographs were improperly admitted at trial; (8) he was denied a fair trial and sentencing proceeding because he was required to stand trial in leg irons; (9) the burden of proof was improperly shifted to him to prove that the death penalty was inappropriate; (10) the jury received improper jury instructions during the penalty phase proceeding; (11) his sentence of death was based upon an unconstitutionally obtained prior conviction; (12) the trial court improperly asserted that sympathy towards him was an improper consideration; (13) nonstatutory aggravating factors were improperly introduced so as to pervert the sentencing phase of his trial; (14) his sentencing jury was misled and misinformed by instructions and arguments; (15) the application of Florida Rule of Criminal Procedure 3.851 violated his rights to due process, equal protection, and access to courts; and (16) the prosecutor improperly argued that evidence of mitigation should be disregarded. All of these claims were found to be without merit or procedurally barred.
[3] In his habeas petition before the federal district court, Remeta raised similar claims to those raised in the rule 3.850 motion in this Court. All claims were denied by the district court. On appeal to the Eleventh Circuit, Remeta raised all but two of those same claims. The Eleventh Circuit summarily found all claims but one to be without merit. It discussed in detail the claim that Florida has violated the Interstate Agreement on Detainers (IAD) because it has failed to return Remeta to Kansas to serve out his life sentences for crimes committed there before being returned to Florida to be executed. In denying this claim, the Eleventh Circuit found as follows: (1) that the district court properly found that Remeta had "actively sought the death penalty in Florida" and was properly informed of the possible consequences of extradition when he waived extradition. (In reaching this conclusion, the court noted that there were letters in the record written by Remeta stating, "If I don't try for the death penalty I'll die in some prison, [t]his is why I'm trying to get extradited." and "I'm gonna try for the death penalty if I can." Remeta also told a psychiatrist that he hoped to be transferred to a state where he would receive the death penalty. Thereafter, Remeta explicitly waived extradition.); (2) that the agreement signed by Florida for extradition provided that Remeta would be returned after trial; (3) that an Executive Agreement was also allegedly entered into between Kansas and Florida agreeing Remeta would not be returned if he received the death penalty, but that the agreement was not in the record; (4) that the failure to return Remeta did not deprive Florida of jurisdiction to try him for murder; (5) if a dispute between Florida and Kansas does exist as to Remeta's return to Kansas, the proper remedy is for Kansas to seek an injunction to force Florida to abide by the IAD agreement and that such a dispute is not a proper matter for federal habeas review.
[4] Huff v. State, 622 So.2d 982 (Fla.1993).