McArthur BREEDLOVE, Petitioner,

v.

Michael W. MOORE, Secretary, Flori-
da Department of Corrections,
Respondent.

No. 98–0953–CIV.

United States District Court,
S.D. Florida.

Sept. 8, 1999.

Todd G. Scher, Lauderdale, FL, for Petitioner.

Fariba Komeily, Department of Legal Affairs, Miami, FL, for Respondents.

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

GOLD, District Judge.

This case is before the court on McArthur Breedlove's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. section 2254. Breedlove was convicted in the Circuit Court for Dade County of first-degree murder, burglary, grand theft and petit theft, and sentenced to death. In the petition for writ of habeas corpus, Breedlove raises thirteen claims of error. The court has analyzed each claim utilizing the procedure set forth in *Neelley v. Nagle*, 138 F.3d 917 (11th Cir.1998).

## I. PROCEDURAL HISTORY

The charges in this case arose from the burglary of a Miami residence during the early morning hours of November 6, 1978, and the murder of one of the occupants of the house, Frank Budnick The jury acquitted McArthur Breedlove of the attempted murder of the second occupant of the house, Carol Meoni, but it convicted him of first-degree felony murder and the underlying felony of burglary, and recommended a death sentence. Following the jury's recommendation, the trial judge sentenced Mr. Breedlove to death based on three aggravating factors: (1) prior convictions for violence; (2) the homicide was committed during a robbery; and (3) the homicide was especially heinous or cruel. The Florida Supreme Court affirmed the conviction and sentence on appeal. *Breedlove v. State*, 413 So.2d 1 (Fla.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982)(*Breedlove I* ). On November 30,

1982, Breedlove filed his first Rule 3.850 motion for post-conviction relief which raised two issues: (1) the denial of defendant's right to be present during a critical stage of the trial; and (2) the state's alleged suppression of exculpatory impeachment evidence.[1] The trial court found that the first issue had been withdrawn in 1989, and the second issue was not persuasive because the state did not have knowledge of the officers' misconduct or, even if it did, the evidence was inadmissible and immaterial. The Supreme Court of Florida affirmed the trial court's ruling. *Breedlove v. State*, 580 So.2d 605 (Fla.1991)(*Breedlove II* ).

On December 18, 1991, Breedlove filed a second Rule 3.850 motion for post-conviction relief. When the trial court denied that motion, Breedlove again appealed to the Florida Supreme Court. Additionally, he filed a petition for writ of habeas corpus with the Florida Supreme Court and asked for a stay of execution. The Florida Supreme Court issued an opinion on the appeal from the denial of the second motion for post conviction relief and the habeas petition. *Breedlove v. Singletary*, 595 So.2d 8 (Fla.1992)(*Breedlove III* ). It found that claims 1,2,4 and 6 were procedurally barred, and rejected claims 5 and 7 for guilt-phase ineffective assistance of counsel. The Supreme Court of Florida did, however, remand the case to the trial court on a finding that Breedlove's allegations of ineffective assistance in the penalty phase were sufficient to require an evidentiary hearing. The Supreme Court also stayed Breedlove's pending execution.

After conducting a two-day evidentiary hearing in Dade County Circuit Court, the trial court issued an order denying relief on the penalty phase ineffective assistance of counsel claims. Breedlove appealed that decision. While that appeal was pending, the Breedlove filed a third motion for post-conviction relief based on the then

---

1. In 1983, a death warrant was signed but the trial court stayed the execution pending reso-

lution of the motion for post-conviction relief.

recently-decided opinion of *Espinosa v. Florida*, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Breedlove argued that under *Espinosa*, the jury instruction on "heinous, atrocious, and cruel" given at his trial was unconstitutionally vague. The trial judge agreed that under *Espinosa*, the jury instructions were unconstitutional. It therefore vacated Breedlove's death sentence and granted the defendant a new sentencing hearing. The state appealed. On appeal, the Supreme Court of Florida reversed and reinstated the death sentence, finding the jury instruction error harmless. *State v. Breedlove*, 655 So.2d 74, 77 (Fla.1995)(*Breedlove IV*). The Florida Supreme Court then considered Breedlove's pending appeal from the denial of relief following the evidentiary hearing on his trial counsel's ineffectiveness at the penalty phase of his trial. The court affirmed the trial court's denial of relief. *Breedlove v. State*, 692 So.2d 874 (Fla.1997)(*Breedlove V*). Rehearing was denied on April 28, 1997.

## II. INITIAL CONSIDERATIONS

Breedlove's petition for habeas corpus raises thirteen claims. Prior to addressing these claims, however, the court must determine several preliminary matters including petitioner's assertion that the case is not governed by the AEDPA, the state's argument that the petition is untimely, the appropriate standard of review under the AEDPA, and the circumstances under which an evidentiary hearing is required under the AEDPA.

### A. Whether the AEDPA applies to Breedlove's Petition.

■ Breedlove argues that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) should not apply to this proceeding because the crimes for which he was convicted were committed prior to the enactment date of the AEDPA. The court is not persuaded by this argument. Petitions for writ of habeas corpus filed after the effective date of the AEDPA are governed by the AEDPA. *See Lindh v. Murphy*, 521

U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997)(new provisions of chapter 153 apply to habeas petitions filed after the effective date of the Act). It is irrelevant that the crimes were committed before the law was enacted. *See Neelley v. Nagle*, 138 F.3d 917, 921–22 (11th Cir.1998)(rejecting petitioner's claim that AEDPA is unconstitutional ex-post facto law and holding that AEDPA constitutionally may be applied to habeas cases filed after AEDPA's effective date). Breedlove's petition for federal writ of habeas corpus was filed on April 28, 1998. The AEDPA was signed into law on April 24, 1996. Accordingly, Breedlove's habeas petition was filed after the effective date of the AEDPA and therefore is governed by the new standards for federal habeas corpus as amended by the AEDPA.

### B. Timeliness of the Petition.

■ Among the new provisions imposed by the AEDPA is subsection (d) to 28 U.S.C. § 2244 which provides a one-year limitations period for filing habeas petitions. Subsection (d)(1)(A) states that the limitation period shall run from date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review. The time during which a properly filed application for post-conviction review is pending is not counted toward any limitations period. 28 U.S.C. § 2244(d)(2).

■ Breedlove's conviction and sentence became final on November 29, 1982. He first round of post conviction claims were denied by Florida Supreme Court on June 25, 1991. Five months and 23 days passed before Breedlove filed his second round of post conviction and habeas claims. The Florida Supreme Court denied relief on April 28, 1997. On April 28, 1998, Breedlove filed this petition. The state argues that the petition is untimely. According to the state, Breedlove should have subtracted from the one-year period the five months and 23 day period of time for which no post-conviction relief was pending. If that period is subtracted out, the

petition was due on during the first week of November 1997.

In response to the state's assertion, Breedlove argues, persuasively, that *Wilcox v. Florida Dept. of Corrections,* 158 F.3d 1209 (11th Cir.1998), negates the state's claim that the 5 month 23 day period of inactivity in 1991 should be subtracted from the one-year period of time. *Wilcox* clearly states that the one-year limitations period established by 28 U.S.C. § 2244(d), "[d]oes not begin to run against any state prisoner prior to the statute's date of enactment." *Id.* at 1211(quoting *Goodman v. United States,* 151 F.3d 1335 (11th Cir.1998)). Consequently, because the AEDPA was not enacted until April 24, 1996, the period of inactivity in 1991 should not be counted in the one-year grace period established by subsection (d). *See also Gendron v. United States,* 154 F.3d 672 (7th Cir.1998)(where state prisoner had properly filed postconviction petition when AEDPA was enacted, the limitations period was tolled until state supreme court denied leave to appeal; district court erred in counting an 18 month period from 1993 to 1994 between conclusion of direct appeal and filing of post-conviction proceedings). Accordingly, Breedlove's petition, filed one year after the Florida Supreme Court's final denial of relief, is timely.

### C. Standard of Habeas Review Under § 2254(d) as Amended by the AEDPA.

■ Under the AEDPA, the federal courts may not grant a writ of habeas corpus on behalf of a person in state custody with respect to any claim adjudicated on the merits by the state court unless the state adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2). Addressing the meaning of these new standards in *Neelley v. Nagle,* 138 F.3d 917 (11th Cir. 1998), the Eleventh Circuit established a three-step process for district courts to follow in evaluating a habeas petition. Step one requires the district court to "survey the legal landscape" at the time the state court adjudicated the petitioner's claim to determine the "clearly established" Supreme Court authority that applied to the case. *Id.* at 923. The law is "clearly established" if United States Supreme Court precedent would compel a particular result in the case. *Id.*

■ In step two, the district court must decide whether the state court adjudication was contrary to clearly established Supreme Court case law or involved an unreasonable application of clearly established law. *Id.* at 923. Two examples of "contrary to" are set forth in *Neelley.* A state court decision is contrary to clearly established Supreme Court case law (1) when state court faces a set of facts essentially the same as those faced by Supreme Court but nonetheless reaches a different legal conclusion; and (2) when a state court fails to apply correct legal principle as set forth in Supreme Court case law. A federal court reviewing a § 2254 petition independently determines what the clearly established federal law as determined by the Supreme Court is, and may grant habeas relief if the state court has decided the law incorrectly. *Id.* at 924.

■ If the state court applied the proper law, in step three, the federal district court must decide whether the state court unreasonably applied clear Supreme Court precedent to the particular facts of the case. *Id.* "Unreasonable application" refers to mixed questions of law and fact. Where the dispute lies not in the meaning of the Constitution, but to its application to a particular set of facts, section 2254(d) restricts the grant of collateral relief. *Id.* citing *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996). In determining whether the state court applied the proper law, the

district court gives great deference to the state court's determination and does not review the issue de novo. The district court can grant the writ "only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Neelley,* 138 F.3d at 924. Thus, this court must evaluate each of Breedlove's claims under the *Neelley* analysis if the claim was addressed by the state court on the merits.

### D. Evidentiary Hearing Under the AEDPA.

Before the enactment of the AEDPA, the disposition of a federal habeas petitioner's request for an evidentiary hearing was controlled by Rule 8(a) of the Rules Governing § 2254 Cases, and by the Supreme Court's decision in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as modified by *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

Rule 8(a) provides that "[i]f the petition is not dismissed at a previous stage in the proceeding," the district court "shall determine whether an evidentiary hearing is required." *Townsend* defined the circumstances in which a federal evidentiary hearing was mandatory, while emphasizing that federal courts retain discretion in many cases to grant or deny a hearing. *Townsend,* 372 U.S. at 312–13, 83 S.Ct. at 756. The *Townsend* Court held that a federal court is empowered to grant an evidentiary hearing if "an applicant for a writ of habeas corpus allege[d] facts which, if proved, would entitle him to relief." *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756; *Beaver v. Thompson,* 93 F.3d 1186, 1190 (4th Cir.1996); *Poyner v. Murray,* 964 F.2d 1404, 1414 (4th Cir.1992). If it was also shown that "the habeas applicant did not receive a full and fair evidentiary hearing in a state court," *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756, a federal evidentiary hearing was mandatory.[2]

■ The AEDPA provision which governs evidentiary hearings in federal habeas corpus cases is 28 U.S.C. section 2254(e)(2). In contrast to *Townsend* and *Keeney* which limited the federal court's discretion to deny an evidentiary hearing, the AEDPA imposes an express limitation on a federal court's power to grant an evidentiary hearing. *Cardwell v. Greene,* 152 F.3d 331, 338 (4th Cir.1998); *see also McDonald v. Johnson,* 139 F.3d 1056, 1060 (5th Cir.1998) ("Consistent with the AEDPA's goal of streamlining the habeas process, § 2254(e)(2) specifies the situations where evidentiary hearings are allowed, not where they are required."). Under the AEDPA, if the petitioner failed to develop the factual basis of a claim in state court, the federal court must deny him an evidentiary hearing unless the petitioner meets one of the two narrow exceptions set forth in section 2254(e)(2)(A) and (B).[3] *See Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). On

---

2. *Townsend* specified that the district court is obligated to hold an evidentiary hearing under the following six circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313, 83 S.Ct. at 757.

3. Under § 2254(e)(2), a petitioner may be entitled to a hearing even where he failed to develop the factual basis for his claim in state court if he shows that one of the following two exceptions exist:

1. the claim relies on a new constitutional law, made retroactive to cases on collateral review by Supreme Court, that was previously unavailable; or

2. the claim relies on a factual predicate that could not have been discovered previously through due diligence; *and*

3. the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

the other hand, if the petitioner has not "failed to develop" the facts in state court, the federal court is not precluded from granting the petitioner an evidentiary hearing. *Cardwell*, 152 F.3d at 337. The circuits which have addressed the "failure to develop" language, have agreed that section 2254(e)(2) does not mean that a hearing is precluded if a habeas petitioner requested, but was denied, and evidentiary hearing by the state courts. *See, e.g. McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir.1998) (holding that "a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission"); *Burris v. Parke*, 116 F.3d 256, 258–59 (7th Cir.1997)("To be attributable to ·a 'failure' under federal law the deficiency in the record must reflect something the petitioner did or omitted").

Even if the district court finds that the petitioner diligently sought to develop the factual basis of a claim for habeas relief, but was denied the opportunity to do so by the state court, the inquiry does not stop there. The petitioner must still persuade the district court that the proffered evidence would affect the resolution of the claim. *See Bolender v. Singletary*, 16 F.3d 1547, 1572 at n. 9 (11th Cir.1994); *Cardwell*, 152 F.3d at 338. "[A] petitioner need not receive an evidentiary hearing if it would not develop material facts relevant to the constitutionality of his conviction." *McDonald*, 139 F.3d at 1060 (quoting *Young v. Herring*, 938 F.2d 543, 560 n. 12 (5th Cir.1991)).

Breedlove argues that if the petitioner satisfies the above-stated conditions, the district court looks to the standards set forth in the pre-AEDPA case of *Townsend* to determine whether an evidentiary hearing is required. This is because the AEDPA did not supersede the *Townsend* factors; it merely established a presumption that the state court judgment is correct and therefore entitled to deference, "unless the applicant establishes one of a number of specific reasons to disregard it."[4] *Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir.1991). But even under *Townsend*, the holding of an evidentiary hearing is within the discretion of the district judge if none of the mandatory factors are met. *Blanco*, 943 F.2d at 1505; *see also* Rule 8 of the Rules Governing § 2254 Cases.

## III. PETITIONER'S CLAIMS

### *Claim I: The Brady Violation Claim.*

█ Breedlove's first claim is that his constitutional rights were violated because the state withheld impeachment information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The information allegedly withheld from the defense concerned two investigating detectives to whom Breedlove gave a transcribed confession, and who later testified at Breedlove's trial. Unbeknownst to Breedlove, Ojeda and Zatrepalek were drug users and dealers at the time they arrested Breedlove and took his confession.[5] Breedlove argues that if he had been permitted to cross-examine these officers about their drug use and drug dealing, the jury may not have convicted him. The state responds that there was no *Brady* violation because the prosecution did not know about the officers' criminal activity. No evidentiary hearing was conducted in the state court on this claim, although Breedlove requested a hearing before the circuit judge and the Florida Supreme Court. Breedlove first raised the *Brady* violation claim in his first postconviction motion, filed in 1982, and decid-

4. Section 2254(e)(1) provides that the state court's determination of a factual issue is presumptively correct. Petitioner may rebut the presumption by clear and convincing evidence.

5. Three years after Breedlove's state trial, the federal government, in 1982, granted Detective Zatrapalek immunity in exchange for his testimony at Ojeda's federal trial. The federal jury convicted Ojeda of conspiracy, racketeering and possession of cocaine with intent to distribute.

ed against him by the Florida Supreme Court in 1991.

**Neelley Analysis.** Under the first part of the *Neelley* analysis, this court must survey the legal landscape at the time of the state court's adjudication of petitioner's claim to determine the "clearly established" Supreme Court authority that applied to the case. *Neelley*, 138 F.3d at 924. Here it is undisputed that the controlling Supreme Court law on this issue is *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution"), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). As the *Neelley* court wrote:

> Under *Brady*, the government may not lawfully convict a defendant if the government has suppressed material exculpatory evidence when the defense requested it. *Bagley* holds that evidence is material if there is a reasonable probability—that is, a probability sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different had the defense had the evidence.

*Id.* *Giglio* and *Bagley* clarified that the *Brady* suppression rule extends not only to information directly exculpating the defendant, but also to impeachment evidence which could be used by a criminal defendant at trial. *Giglio*, 405 U.S. at 153, 92 S.Ct at 766; *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3380.

Next, this court "must determine whether the state court adjudication was contrary to the clearly established Supreme Court case law, either because the state court failed to apply the proper Supreme Court precedent, or because the state court reached a different conclusion on substantially similar facts." *Neelley*, 138

F.3d at 924. Because the facts of *Brady* and *Bagley* and *Giglio* are different from the facts of Breedlove's case, the proper inquiry in this case is whether the state court failed to apply the correct legal principles to decide the case. *Neelley*, 138 F.3d at 923–24. The Florida Supreme Court evaluated Breedlove's claim under a *Brady* analysis, see *Breedlove v. State*, 580 So.2d 605, 607 (1991), therefore, the Florida court applied the proper Supreme Court precedent.

The next step is to determine whether the state court unreasonably applied *Brady* and its progeny. A state court's decision must stand unless it is so clearly incorrect that it would not be debatable among reasonable jurists. *Neelley*, 138 F.3d at 924. The Florida Supreme Court found no *Brady* violation, noting that "in the absence of actual suppression of evidence favorable to the accused...the state does not violate due process in denying discovery," *Breedlove v. State*, 580 So.2d 605, 607 (Fla.1991). In Breedlove's case there was no suppression of information because at the time of Breedlove's trial, the prosecution lacked actual or constructive knowledge of the detectives' criminal activities. Internal review files showed that "[t]he detectives' personal knowledge of their criminal activities [ ] was not readily available to the prosecution." *Id.* at 606–607. And the detectives were not required to disclose this information to the prosecutors because they had a right not to incriminate themselves. *Id.* at 607. Thus, the prosecution cannot be held to have constructive knowledge of the criminal activities.

Moreover, the Florida court held that even if the court were to assume that the prosecution had knowledge of the detectives' activities but failed to disclose them, there would be no *Brady* violation because the information allegedly suppressed, was not material. *Id.* To constitute a *Brady* violation, the suppressed evidence must be material. *Id.* citing 373 U.S. at 87, 83 S.Ct. at 1196–97. "[E]vidence is material only if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. In Breedlove's trial, there was no reasonable probability that evidence of the detectives' criminal activities would have changed the outcome because the evidence of the officers' activities would not have been admissible. As such, the evidence was not "material." Id. citing *Delap v. State*, 505 So.2d 1321 (Fla.1987). Where a state witness is merely under investigation, the witness cannot be cross-examined about the investigation if it is remote in time or, as in Breedlove's case, totally unrelated to the underlying case so as to be irrelevant to demonstrating the witnesses' bias, motive for testifying, or prejudice. Id. at 609. Because the detectives' criminal activities were collateral to any issues in Breedlove's trial, questions about the activities would not have been permissible and therefore, there is no reasonable probability that the outcome of the trial would have been different. Id. at 609. Consequently, the Florida Supreme Court found that Breedlove also failed to satisfy *Brady's* materiality requirement.

Breedlove has not shown that the Florida court "unreasonably" applied Supreme Court precedent as discussed in *Neelley v. Nagle*. To the contrary, far from being "not debatable," the state court's decision is consistent with the Eleventh Circuit's decision in *Delap v. Dugger*, 890 F.2d 285, 298 (11th Cir.1989) in which similar evidence of unrelated illegal activity by a police officer witness was found to be not material under the standards set forth in *Bagley*.

> Our examination of the circumstances convinces us that the evidence concerning Brumley's involvement in drug smuggling activities was not material under the *Bagley* test. Delap argues that exposure of Brumley's illegal activities to the jury would have cast substantial doubt on his credibility. First of all, as the district court noted, it is highly questionable whether the evidence would have been admissible under Florida law. Brumley had not been charged nor convicted of any crime during Delap's first or second trials. Brumley was not indicted until late 1981, well after Delap's October 1978 second trial. Therefore, his illegal activities would not be admissible as a prior criminal conviction under Fla.Stat. § 90.610. See *Rolle v. State*, 386 So.2d 3 (1980) (general rule is that witness may not be interrogated as to prior arrests or pending charges, but only as to prior convictions). Nor is it likely that the evidence would be admissible under Fla.Stat. § 90.608 as evidence of bias in this case, where no criminal proceeding or even an investigation had begun.

890 F.2d at 299. *Delap* supports a finding by this court that the state court decision was a good faith and reasonable application of the United States Supreme Court precedent.

Moreover, Breedlove has not shown that this court should conduct an evidentiary hearing on this claim. The Supreme Court of Florida declined to grant Breedlove an evidentiary hearing, agreeing with the trial judge that an evidentiary hearing on the *Brady* issue was not required because even if the facts alleged by Breedlove were assumed to be true, they did not form the basis for relief. 580 So.2d at 606. Similarly, federal courts, both prior to and after the enactment of the AEDPA, uniformly have held that, "no evidentiary hearing is necessary where the proffered evidence would not affect the resolution of the claim." See e.g., *Bolender v. Singletary*, 16 F.3d 1547, 1555 at n. 9 (11th Cir.1994)(citing *Stephens v. Kemp*, 846 F.2d 642 (11th Cir.1988)) (no evidentiary hearing necessary on ineffective assistance claim where evidence petitioner sought to introduce would not affect resolution of issue), In this case, because an evidentiary hearing would not aid in the resolution of the *Brady* violation claim, Breedlove is not entitled to a federal evidentiary hearing.[6]

---

**6.** Although petitioner's counsel indicated a

desire to present testimony from the trial

### Claim II: Guilt–Phase Ineffective Assistance of Counsel.

■ Petitioner's second claim is that he received ineffective assistance of counsel at the guilt phase of trial. Specifically, Breedlove contends that counsel's representation was deficient because he failed to investigate the following three matters: a) an alibi defense through the statements of Breedlove's brother, Elijah Gibson; b) Breedlove's claim that his confession was coerced; and c) an intoxication defense. The guilt-phase ineffective assistance of counsel claims were first raised during the second 1991 post-conviction proceedings and were repeated in the petition for writ of habeas corpus. The state courts found that Breedlove had not met the substandard performance and prejudice test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and denied the claim without an evidentiary hearing, after considering the affidavits provided by the petitioner, in light of the record of the trial proceedings. *Breedlove v. Singletary*, 595 So.2d 8, 11 (Fla.1992)(*Breedlove* III).

**A. Brother's Statement.** First, Breedlove claims that his trial attorney failed to investigate alibi evidence which indicated that Breedlove was home at 2:30 a.m., the approximate time of the offense.

The alibi evidence provided by Elijah Gibson concerning the time Breedlove was home is conflicting. Portions of a police report made by Detective McElveen reflect the substance of a conversation between McElveen and Gibson, who stated that Breedlove returned home at approximately 2:30 a.m., stayed for approximately an hour, left again, and returned home between 4:00 and 4:30 a.m. The police report also states that both Breedlove's mother and brother observed bloodstains on Breedlove's pants and that Gibson described jewelry, later established to have been taken from the victim's residence, in Breedlove's possession. (McElveen Report).

Although this police report was not provided to defense counsel,[7] a sworn statement given by Gibson was provided to defense counsel prior to trial. In that sworn statement, Gibson states that he was awakened by Breedlove around 2:30 p.m., that Breedlove stayed for half and hour, left, and returned between 3:30 and 4 a.m. (November 10, 1978 Sworn Statement of Gibson).

Defense counsel also deposed Gibson prior to trial. At this pretrial deposition, Gibson stated that Breedlove woke him up at approximately 12:30 to 1 a.m., stayed

prosecutor, Mr. Stelzer, with respect to the latter's knowledge of Ojeda's criminal activities, petitioner has failed to show that his claim would be advanced by an evidentiary hearing on this issue. Petitioner's counsel represented that the parties had not contacted Stelzer with respect to any knowledge, in order to "keep him intact." App. 2 at R. 350–51. Moreover, as noted by the State post-conviction court, the transcripts of the federal proceedings provided by the petitioner reflected that in 1982, Stelzer had testified that, although he had a "mental picture" of someone "holding some powder in the vicinity of [Ojeda's] nose," at a party that he had attended, his recollection was faulty because the incident took place at a time when Stelzer did not know Ojeda well and thus could not tell whether it was Ojeda or someone else that he had observed. There has been no proffer that Stelzer's 1982 faulty recollection has improved with age. As such, there is no demonstration that an evidentiary hearing at this

time would aid the resolution of any issues with respect to the *Brady* claim. *See Cardwell v. Greene*, 152 F.3d at 338 (no evidentiary hearing permitted where the defendant "has failed to forecast any evidence beyond that already contained in the record, or otherwise to explain how his claim would be advanced by an evidentiary hearing.").

7. Petitioner also argued to the state court that to the extent the state failed to disclose McElveen's police report, *Brady* was violated. The Florida Supreme Court rejected this argument, finding that there was no *Brady* violation because Breedlove failed to show that the material in the police report could not have been found through reasonably diligent preparation or that nonproduction of this report prejudiced him in light of all the other statements by Gibson on this same issue. *Breedlove I*, 413 So.2d at 4. The supreme court's conclusion is not unreasonable.

about half an hour, left, and returned home at approximately 3:00 to 3:30 a.m. During the deposition, Gibson also testified that on the night of the offense, Breedlove showed him jewelry resembling the jewelry taken from the victim. (Gibson dep. at 11–13).

Another set of times was provided by Gibson in an interview he had with Detective Zatrepalek. At the Zatrepalek interview, Elijah Gibson told the detective that Breedlove returned home at approximately 3:00 a.m. (Zatrepalek depo. p. 112). Additionally, in 1991, Gibson submitted an affidavit for the defense which stated that on the night of the murder, he played pool with Breedlove until 7–8 p.m. and that Breedlove returned home around 2 a.m., drank and used drugs, and then left again for about a half hour to get more beer. Gibson also stated that he himself was very high on drugs at that time. (Gibson's 1991 affidavit, petition pp. 70–71).

Breedlove argues his counsel's failure to investigate the alibi defense deprived him of a fair trial. In response, the state asserts that trial counsel was not deficient in failing to investigate the potential alibi defense presented by Gibson's statements because, as the Florida courts found, and the record demonstrates, defense counsel had ample evidence on the issue: he deposed Gibson; possessed Gibson's sworn statement to McElveen; and knew what Gibson told Zatrepalek. *See Breedlove III*, 595 So.2d at 11. In any event, there was no prejudice because Gibson was not a credible witness with respect to dates and times. Gibson's statements about time were clearly contradictory. Finally, the state points out that the alibi defense would have contradicted another defense strategy: during closing argument, defense counsel suggested that Gibson was a "suspect" who could have been the person who committed the murder. (T. 1152–54, 1218–91). In sum, the state argues that defense counsel's representation of Breedlove was not deficient because (a) the record shows that counsel did investigate the alibi and (b) Gibson was not a credible witness with regard to time and, if put on

the stand, he could have provided damaging testimony about bloody pants and the stolen jewelry, and (3) defense counsel chose to utilize Gibson as a suspect instead of a reliable witness. For these reasons, the state asserts that the state court's rejection of the claim for ineffectiveness, based on failure to present at an alibi, was not unreasonable.

**B. Evidence of coercion.** Second, Breedlove contends that his counsel failed to conduct an adequate investigation of the case because he overlooked evidence important to Breedlove's claim that he was beaten by police and forced to confess. Before trial, Breedlove moved to suppress evidence of inculpatory statements he made to investigating officers on two occasion, asserting that the confessions were coerced; he claims he was physically abused by detectives during the first interrogation and threatened during the second interrogation. A suppression hearing was held prior to trial where Breedlove testified to the following events:

He was arrested for loitering, prowling, and giving a false name on November 8, 1978 and taken to the county jail. On November 9, he was beaten in the stomach and chest by a police officer and then taken to a safety cell. No other inmates were present in the safety cell where he was held for five days. (Trans. Supp. Hearing, app. 1 at 309–310, 317, 319). On November 21, 1978, he was taken to the department of safety where he was questioned by police officers for a second time. (Trans. Supp. Hearing, app. 1 at 311). On that day, he confessed because he was threatened with another beating. He was not, however, beaten on that day. (Trans. Supp. Hearing, app. 1 at 313–15).

At the suppression hearing, the police officer denied beating Breedlove. The trial court denied the motion to suppress the confession.

In 1991, the defense obtained two affidavits that allegedly supported Breedlove's claim that he was beaten by police. The first was submitted by Charlie Williams, a

neighbor of Breedlove's stepfather. Williams stated that he saw Breedlove right after he was arrested. Two police officers brought a bruised-faced Breedlove to his step-father's house in handcuffs and ripped clothes. The second affidavit was from John Lane, a cellmate of Breedlove. According to Lane, right after Breedlove was arrested, he was placed in a large cell with Lane and many other inmates. Breedlove was taken from his cell. When he came back, he was holding his stomach and crying. Lane said Breedlove told him that he had just been beaten by the police and coerced to make a confession. Breedlove argues that this information was available prior to his trial, but defense counsel failed to conduct an adequate investigation and therefore neglected to present this testimony at the suppression hearing and trial.

In response, the state contends that the statements of Williams and Lane are not credible because they are contradicted by the record and Breedlove's own testimony at the suppression hearing. For example, Lane's statement that he was in the same cell with Breedlove after the beating is contradicted by Breedlove's testimony that he went to a safety cell and was held there alone for five days after the beating. Lane's assertion that Breedlove was beaten into giving a confession is contrary to Breedlove's testimony at the suppression hearing that he did not give a confession on the day he was beaten. Similarly, Williams's statement that he saw Breedlove taken to his step-father's home after his arrest is contradicted by Breedlove's testimony that he was taken to the county jail after his arrest. Breedlove makes no assertion that he was taken to his step-father's house after the beating. And Williams claimed that he saw Breedlove's beaten face, but Breedlove claimed he was beaten only on the chest and stomach. The state asserts that under *Strickland*, Breedlove's counsel cannot be deemed deficient for failing to present witnesses whose testimony was expressly contradicted by Breedlove's own testimony.

**C. Evidence of Intoxication at Time of Crime.** Breedlove contends that his counsel was ineffective because he failed to conduct an investigation regarding Breedlove's intoxication on the night of the homicide even though defense counsel knew that Breedlove told detectives that he had been drinking on the night of the offense and evidence showing that Breedlove had a long history of substance abuse was readily available. Petitioner claims counsel was also ineffective because he failed to present a mental health expert at trial to testify regarding the effects of alcohol and drugs on the ability to form specific intent.

In response to this argument, the state asserts that defense counsel did investigate an intoxication defense. At the time of trial, defense counsel was well-aware of the defendant's history of alcohol and drug abuse and knew that Breedlove had told police that he had bought a bottle of liquor on the night of the incident, which he drank after the incident. But there was no information available as to how much alcohol or drugs, if any, Breedlove had consumed prior to the murder. Consequently, Breedlove would not have been entitled to a jury instruction on intoxication. *See Gardner v. State*, 480 So.2d 91, 93 (Fla.1985). Moreover, it is significant that Breedlove consistently denied committing the crime. Consequently, counsel was not deficient in failing to raise an intoxication defense when it would be inconsistent with defendant's claim that he did not committed the murder. *See Combs v. State*, 525 So.2d 853 (Fla.1988).

*Neelley Analysis.* Under the first step of the *Neelley* analysis, the clearly established case law from the United States Supreme Court on the issue of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Florida courts analyzed Breedlove's ineffective assistance claim under the standards articulated in *Strickland*. *See Breedlove III*, 595 So.2d at 11. The factual circumstances in *Strickland* are not sim-

ilar to the instant case. *Strickland* involved the propriety of defense counsel's failure to seek out character witnesses and request psychiatric examination or a presentence report at the penalty phase. Thus it can not be said that the Florida courts reached a different conclusion on substantially similar facts under the clearly established law. The issue, therefore, is whether the state court, in contravention of Supreme Court case law, failed to apply the correct legal principles to decided the case. *Neelley*, 138 F.3d at 923. This court does not find that the Florida Supreme Court unreasonably applied *Strickland* to the facts of this case. The state court's conclusions were in accordance with factually and legally similar decisions from the Eleventh Circuit.

To obtain relief under *Strickland*, Breedlove was required to demonstrate two things: (1) that his counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that he suffered prejudice as a result of that deficient performance. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 (1984); *Hill v. Moore*, 175 F.3d 915, *922* (11th Cir.1999). Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Whether petitioner's counsel were ineffective is a mixed question of law and fact subject to de novo review. *See Hill*, 175 F.3d at 921 (11th Cir.1999); *Mills v. Singletary*, 161 F.3d 1273, 1285 (11th Cir.1998). To be entitled to an evidentiary hearing on this matter, petitioner must proffer evidence that, if true, would entitle him to relief. *Baldwin v. Johnson*, 152 F.3d 1304, 1312 (11th Cir.1998).

The Florida Supreme Court addressed Breedlove's claim of ineffective assistance of trial counsel in *Breedlove III*, 595 So.2d at 10 and found that the trial court correctly resolved these claims and that Breedlove was not entitled to an evidentiary hearing on the ineffective assistance claims because he did not allege specific facts not conclusively rebutted by the record. *Id.* at 11. Rejecting the failure to conduct investigation on the alibi argument, the supreme court found that defense counsel had not been deficient in conducting an investigation because the record disclosed that counsel had indeed conducted an investigation; "counsel deposed Breedlove's brother, the 'alibi' witness, had the brother's sworn statement to a police officer, and knew what the brother had told another officer." 595 So.2d at 11. The state court's factual findings are entitled to great deference. § 2254(e)(1); *Blanco*, 943 F.2d at 1505.

In any event, the record demonstrates that Gibson was not a credible witness with regard to time and, if put on the stand, he could have provided damaging testimony about bloody pants and the stolen jewelry. Instead of using Gibson as a defense witness, it appears that defense counsel chose to portray Gibson as a suspect to the jurors. In light of these circumstances, the state court's determination of the claim for ineffectiveness, based on failure to present at an alibi, was not unreasonable. *See Alexander v. Dugger*, 841 F.2d 371, 374–75 (11th Cir.1988) (counsel can not be ineffective for failing to call alibi witness who had testified at a pretrial deposition in a manner inconsistent with defendant's claim).

The claim that defense counsel was deficient because he failed to investigate Breedlove's alleged beating by police officers, was also rejected by the Florida courts because it was belied by the record. Breedlove asserts that counsel should have obtained statements from Williams and Lane, such as the ones given in their 1991 affidavits. But Williams's and Lane's statements were contradicted by Breedlove's own testimony at the suppression hearing. Rather than failing to investigate defendant's claim that his confession had been coerced by a police beating, defense counsel requested and was granted a pretrial hearing on the issue. The Florida Supreme Court noted that at the suppression hearing, defense counsel vigorously and conscientiously prosecuted the motion

to suppress, presenting the defendant's version of events. 595 So.2d at 11. The Florida court's determination is a good faith application of the standards set forth in *Strickland v. Washington:* a defense counsel can not be deemed deficient for failing to present witnesses who contradict the defendant's own testimony. *Alexander,* 841 F.2d at 374–75.

Finally, this court finds that the state court's rejection of the ineffective assistance of counsel claim for failing to pursue an intoxication defense was also a reasonable application of *Strickland.* The Florida Supreme Court stated, "The record also discloses that trial counsel knew of Breedlove's alcohol and drug use. While the record shows that Breedlove had a history of alcohol and drug abuse, it also shows a lack of available facts from which an intoxication defense could be established." 595 So.2d at 11. The state court's conclusion was in accordance with Strickland and Eleventh Circuit precedent. *See Hill v. Moore,* 175 F.3d 915, 923 (11th Cir.1999)("defendant was not prejudiced by trial counsel's alleged deficiency in failing to elicit testimony elaborating on amounts of cocaine defendant used prior to bank robbery given the defendant's failure to show evidence on which jury could have found that he was so intoxicated that he was unable to form an intent to kill."). Moreover, defense counsel's failure to pursue the intoxication defense was not deficient because it was in accordance with the defendant's own insistence that he did not commit the charged crimes. Trial counsel can not be deemed deficient within the standards of *Strickland* for failing to present a defense that was inconsistent with the primary defense at trial. *See Nelson v. Nagle,* 995 F.2d 1549, 1554 (11th Cir. 1993) (failure to present evidence of intoxication which contradicted defense of factual innocence was not ineffective); *Harich v. Dugger,* 844 F.2d 1464, 1470 (11th Cir. 1988) (where trial strategy was to maintain factual innocence, counsel's failure to present intoxication defense was not deficient even absent an evidentiary hearing).

In making its determination on petitioner's ineffectiveness claim, this court is guided by the well-established principle that a decision not to investigate must be assessed for reasonableness under all circumstances, giving great deference to counsel's judgment. *Williams v. Head,* 185 F.3d 1223, 1236 (11th Cir.1999); *see Mills v. Singletary,* 63 F.3d 999, 1024 (11th Cir.1995) ("The question is whether ... ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (quotation and citation omitted); *Gates v. Zant,* 863 F.2d 1492, 1498 (11th Cir.1989)("Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense."). In this case, the Florida court found that counsel's investigation decisions were reasonable. Insofar as the performance prong of an ineffectiveness inquiry is concerned, once the court concludes that declining to investigate further was a reasonable act, it need not look to see what a further investigation would have produced. *See Rogers v. Zant,* 13 F.3d 384, 388 (11th Cir.1994). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

Because the petitioner could not satisfy the requirements of *Strickland,* he cannot demonstrate that the evidence proffered, if true, would entitle him to relief. For this reason, he is not entitled to an evidentiary hearing on this claim. *See Hill,* 175 F.3d at 923.

### Claim III: Admission of Breedlove's Confession into Evidence.

In Claim III, Breedlove asserts that the trial court should have excluded a

statement he gave to Officer Zatrepalek because the statement was taken after he had invoked his right to remain silent and it was coerced by police threats. He argues that because his right to remain silent was not "scrupulously honored," it was taken in violation of his Fifth Amendment rights and therefore should have been suppressed. In response, the state asserts that the trial judge did not err in admitting the statement because, after a full evidentiary hearing, it found that Breedlove had not invoked his right to remain silent and the statement was not coerced.

*Facts.* Breedlove was arrested on November 9, 1978, based on physical evidence taken from his home and statements made by his mother and brother. Prior to his indictment, Breedlove consulted his court-appointed attorney who counseled him not to make any statements in the absence of counsel. On November 21, 1978, however, Breedlove gave a statement to Officer Zatrepalek in which he admitted to breaking into the house, stealing numerous items, taking a butcher knife and stabbing a man who had been asleep in a bedroom, and stealing a bicycle to make his getaway.

Subsequently, Breedlove's counsel moved to suppress the statement Breedlove gave to Zatrepalek, asserting that it was made as a result of an unlawful interrogation. Counsel argued that Zatrepalek coerced Breedlove into giving the statement after he had asserted his right to remain silent. The trial judge held an evidentiary hearing on the motion to suppress. At the hearing, Breedlove testified that officers Zatrepalek and Ojeda had beaten him on November 9, so he didn't want to go with the officers on November 21. He said he told the officers who escorted him to the Dade County jail that he did not with to be taken there. A correctional officer. Shultz, testified at the suppression hearing that on the day Breedlove gave his statement to Zatrepalek, Breedlove had said something like "They had better the people I want to talk to" or "I don't want to talk to certain detectives." On seeing the officers, Shultz said Breedlove stated, "I am not talking to them," and the officers said something like "Eventually you will talk to us." Shultz also said that prisoners could refuse to leave their cells in order to avoid interrogation, but that Breedlove never did so. Officer Zatrepalek also testified at the suppression hearing. He stated that when Breedlove arrived at the police station on November 21, he read him his Miranda rights and Breedlove signed a form indicating that he understood his rights. (R. 224–28). Breedlove then asked to speak with his mother. Detectives brought his mother to the police station where Breedlove spoke with her alone, in an office, for approximately thirty minutes. (R. 229–31). When the mother emerged from the office, she told Zatrepalek that her son wanted to speak with him. (R. 232). Zatrepalek went into the office and Breedlove confessed to the murder. At the conclusion of the suppression hearing, the trial judge found that Breedlove understood his rights on both the 9th and 21st of November and that he had freely and voluntarily waived those rights.

Petitioner's claim that his Fifth Amendment rights were violated when he was interrogated after having asserted his right to remain silent, was raised on direct appeal. *See Breedlove I*, 413 So.2d at 5–6. Based on the transcript of the suppression hearing, the Florida Supreme Court wrote that the following events occurred on November 21. "After arriving at the station, Detective Zatrepalek read Breedlove his Miranda rights and Breedlove signed the rights form. Breedlove then asked to speak with his mother and was not questioned during the hour or so before she arrived. He spoke with her in private and then asked her to tell Zatrepalek that he would make a statement. After speaking with the detectives, Breedlove was again read his rights, signed another card, and made a formal statement." *Id.* at 5. In affirming the trial court's ruling, the Florida Supreme Court held as follows:

Breedlove now claims that the statement, "eventually you will talk to us,"

was an implied threat constituting coercion and tainting the ensuing statement so that no proper waiver occurred. From the totality of the circumstances, it does not appear that the statement was coerced. Rather, Breedlove chose not to exercise his right to remain silent or to have counsel present, making the damaging statement after talking with his mother. The judge properly concluded that he freely and voluntarily made the statement.

*Breedlove I,* 413 So.2d at 6.

***Neelley Analysis.*** The parties are in agreement that the United States Supreme Court cases applicable to this claim are *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Both cases were specifically relied upon by the state courts. *See Breedlove I,* 413 So.2d at 5–6. Breedlove argues that the Supreme Court of Florida's application of *Miranda* and *Mosley* was unreasonable in light of the facts of Breedlove's case. In *Mosley,* the accused was arrested on two robbery charges. After interrogation commenced, the defendant stated "that he did not want to answer questions about the robberies." *Mosley,* 423 U.S. at 97, 96 S.Ct. 321. Interrogation then ceased. *Id.* Several hours later, another officer, who was investigating a murder for which the defendant had not been arrested, sought to interrogate him, and the defendant, after waiving his *Miranda* rights, confessed to the murder. *Id.* at 98, 96 S.Ct. 321.

The Supreme Court held that the critical factor in such a situation was whether the "right to cut off questioning" was "scrupulously honored." *Id.* at 104, 96 S.Ct. 321. In resolving the claim, the *Mosley* Court held that since the "police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been the subject of the earlier interrogation," the "right [of Mosley] to cut off

questioning was fully respected in this case." *Id.* at 105–06, 96 S.Ct. 321.

In this case, before going to the Dade County jail, Breedlove said something like "They had better be the people I want to talk to" or "I don't want to talk to certain detectives." When he saw certain officers, he said, "I am not talking to them." These statements were ambiguous in that they could reasonably be interpreted to mean that Breedlove was not invoking his right to remain silent, he merely didn't want to talk to certain officers. In light of the circumstances of this case, including Zatrepalek's Miranda instructions on arrival at the police station, Breedlove's signing of a form waiving his Miranda rights, and Breedlove's intervening conversation with his mother, the Florida courts' determination—that these statements were not an unequivocal invocation of his right to remain silent or to have counsel present—is not unreasonable or contrary to established law. *See Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him"); *Smith v. Illinois,* 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984)("an accused's request ... may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself."); *United States v. Mikell,* 102 F.3d 470, 476 (11th Cir.1996)("If the statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.").

The Florida courts also concluded that Breedlove's confession was given knowingly and voluntarily and that the statement "eventually you will talk to us" did not amount to coercion. This finding was not contrary to established law. In light of the Miranda warnings given after the officer's remark, and Breedlove's acknowledgment that he understood and waived his right to remain silent, the remark was

insufficient to induce a confession. *See Baldwin v. Johnson*, 152 F.3d 1304, 1321 (11th Cir.1998)(record demonstrated that defendant made his confessions knowingly and voluntarily, though defendant testified that his statements were coerced through threats and beatings; none of defendant's witnesses corroborated his story, law enforcement officers read defendant Miranda warnings on five separate occasions before questioning him or obtaining statements from him, defendant signed at least four separate forms waiving his Miranda rights, and officer who took defendant's statement testified that neither he nor anyone in his presence threatened or physically abused defendant). Moreover in this case, Breedlove himself initiated the conversation with Zatrepalek after talking to his mother. Under the circumstances, the police officers' remark was insufficient to invalidate Breedlove's subsequent waiver of his right to remain silent. *See Henderson v. Singletary*, 968 F.2d 1070, 1073 (11th Cir. 1992) (confession properly admitted where defendant "both initiated the dialogue and waived his previously asserted rights to silence and counsel.").

Petitioner did not request an evidentiary hearing on this claim, stating that the claim "essentially involves a matter of law." Respondent agrees, adding that petitioner was afforded a full and fair pretrial suppression hearing, accordingly an evidentiary hearing is not permissible under § 2254(e)(2).

### Claim IV: Hearsay Statements of Petitioner's Mother and Brother.

■ In his fourth claim, the petitioner asserts that his right to confront witnesses was violated by the trial court's erroneous admission of the hearsay statements of his mother, Mary Gibson, and brother, Elijah Gibson. When this claim was first raised on direct appeal, the Florida Supreme Court found that there was no error in admitting the statements because they were not hearsay; they were not admitted to prove the truth of the matter asserted. Rather, they were admitted to show the effect these statements had on Breedlove's state of mind at the time he gave his confession. *Breedlove I*, 413 So.2d at 6–7.

***Facts.*** The Gibson were questioned at their home on November 9, 1978, and subsequently gave formal statements at the police department. Among other things, they told police that Breedlove returned home on the night of the murder with a stolen blue bicycle, there was blood on his pants, and he was in possession of a watch with rhinestones around the face.[8] Neither Mary Gibson nor Elijah Gibson testified at trial, but the substance of these statements was introduced through the testimony of police officers.

At trial, when officers Ojeda and Zatrepalek were testifying about the circumstances surrounding Breedlove's November 21 confession, they described what had been said that day. In describing what was said to Breedlove, both officers alluded to the substance of the informal conversations they had with the Gibsons. For example, Ojeda testified that when he spoke with Breedlove on the 21st, he told Breedlove what his brother had said about the blue bicycle. Defense counsel objected to this testimony on hearsay grounds. (R. 932). The trial judge overruled the objection on a finding that the statement was not being offered for the truth of what was said; rather, it was being offered to show what Breedlove heard during the course of questioning, and the effect this statement had on Breedlove's state of mind at the time he confessed. Other comments made by the mother and brother came in the same way. The trial judge gave a cautionary instruction, informing the jurors that the statements were not made for the pur-

---

8. These statements were damaging to Breedlove because after the murder, a neighbor testified that she saw a man riding away from the victim's house on a blue bicycle; a stolen blue bicycle, taken from the home of a neigh- bor of the victim, was later found at the Gibson's house; and a watch fitting the brother's description was among the items stolen from the victim's home at the time of the murder. (T.1 593–95 R. 933–34).

pose of proving the truth of the matter, but only to show that Breedlove was confronted with the statements by the officers. (R. 934). Prior to cross-examination, the defense said it would go into the Gibson's statements because they had been received for an impermissible purpose. The trial judge cautioned the defense that it would have to live with what this approach elicited. When Zatrepalek testified, the trial judge issued similar rulings.

In closing argument, defense counsel raised the issue of the Gibson's comments, wondering why they had not been called to testify, suggesting that the mother or brother had lied when they made these statements because they, not Breedlove, had committed the murder. (R. 1152–54). In rebuttal, the state responded directly to defense counsel's argument, stating that it had not wanted to compel a mother to testify against her son, or a brother against his brother, in a case in which the state was seeking the death penalty. The state informed the jury that the Gibsons had also given sworn statements. (R. 1185). The prosecutor argued that the Gibsons had told the truth in those statements, if they hadn't the defense would have brought them in to testify. The state then tied the Gibson's formal statements to the detectives testimony.

Defense counsel moved for a mistrial, contending that the state had put the truth of the Gibson's statements in issue. Defense counsel also asked that the jury be instructed to disregard the state's closing argument or disregard the officers' testimony about what the Gibsons had said. Referring to its earlier instruction on the issue, the trial court refused to reinstruct. When defense counsel made his final argument, he again referred to the mother and brother's statements.

> [The stolen blue bicycle] could have been ridden by the other four adults in that house, and what about those people? What did they do? They pointed the finger at my client. Sure it is his mother and brother. I do not like mothers and brothers testifying like that against

my client. They said, "He did it. He is the one." Mr. Godwin would have you believe we can call people like that.

(R. 1218 emphasis added).

Breedlove does not seek an evidentiary hearing on this claim, stating that only a matter of law is involved.

***Neelley Analysis.*** In addressing this claim, the Florida Supreme Court relied on United States Supreme Court precedent in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), and *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), noting the well-established rule that out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted.

> 'The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements.' *Dutton v. Evans*, 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). In *Dutton* the Court went on to say that "the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' *California v. Green*, 399 U.S. at 161, 90 S.Ct. at 1936." 400 U.S. at 89, 91 S.Ct. at 219. On the other hand, "[o]ut-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." *Anderson v. United States*, 417 U.S. 211, 219, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974). Merely because a statement is not admissible for one purpose does not mean it is inadmissible for another purpose. *Hunt v. Seaboard Coast Line Railroad Co.*, 327 So.2d 193 (Fla.1976); *Williams v. State*, 338 So.2d 251 (Fla. 3d DCA 1976). The hearsay objection is unavailing when the inquiry is not directed to the truth of the words spoken, but, rath-

er, to whether they were in fact spoken. *Id.*

*See Breedlove I,* 413 So.2d at 6. Applying the law of these cases to the facts of Breedlove's case, the Florida Supreme Court held that the court properly admitted the detective's testimony about what the Gibsons had said because it was not hearsay; it came in to show the effect on Breedlove rather than for the truth of those comments. Moreover, the judge cautioned the jury on how to use this testimony. *See Breedlove I,* 413 So.2d at 7. It further reasoned that although the prosecutor's remarks in his rebuttal closing argument may have been improper, they did not prejudice Breedlove in light of defense counsel's own prior argument conceding the truth of the statements. *Breedlove I,* 413 So.2d at 7.

Petitioner asserts that the clearly-established Supreme Court law governing this claim is *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) and *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). These cases stand for the proposition that "the right of confrontation is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer,* 380 U.S. at 404–05, 85 S.Ct. 1065; *accord Douglas,* 380 U.S. at 418–19, 85 S.Ct. 1074. According to petitioner, the Florida Supreme Court unreasonably applied the principles of these case when it held that the statements were not hearsay because they came in to show the effect on Breedlove, not to prove the truth of the matter asserted.

But in making this argument, the petitioner does not explain specifically how his rights under the confrontation clause were violated by the introduction of these statements for non-hearsay purposes. Nor does he explain why, under the facts of this case, the *Pointer* and *Douglas* cases compel a different result. He cites to no cases which hold that a defendant has a constitutional right to confront persons whose statements were used for non-hearsay purposes. Nor does he specifically identify how the state court's ruling de-

parted from established precedent or was unreasonable under the facts of the case. In fact a review of established Supreme Court precedent shows that a non-hearsay statement, made not to prove what happened at the murder scene but to prove what happened when respondent confessed, raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination is satisfied by the officer's presence on the witness stand. *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–2082, 85 L.Ed.2d 425 (1985); *see also United States v. Inadi,* 475 U.S. 387, 398 n. 11, 106 S.Ct. 1121, 1128, 89 L.Ed.2d 390 (1986)("We explained just last Term that admission of nonhearsay 'raises no Confrontation Clause concerns.' Cross-examination regarding such statements would contribute nothing to Confrontation Clause interests.") (citation omitted). In light of this authority, this court finds that the state court adjudicated petitioner's claim in accordance with clearly-established Supreme Court precedent and that its determination was not unreasonable.

### Claim V: Trial Court's Resolution of the Penalty Phase Ineffective Assistance of Counsel Claim.

■ In his fifth claim, the petitioner contends that he is entitled to an evidentiary hearing and relief on his claim of ineffective assistance of counsel at the penalty phase. This claim is grounded on counsel's alleged deficient performance in developing and presenting mitigating circumstances to the jury, including:

… (1) failing to investigate Breedlove's background; (2) failing to furnish mental health experts with information concerning Breedlove's background, the facts of the offense, or his mental status and evidence of his intoxication on the night of the offense, all of which might have served as a basis to support the experts' testimony as to mitigating factors; and (3) failing to call as lay witnesses the family members and friends who could have testified as to potential

mitigating circumstances of abandonment by his mother and abuse by his father during childhood as well as his mental instability and his addiction to drugs and alcohol.

*Breedlove v. State,* 692 So.2d 874, 877 (Fla.1997)(*Breedlove V*).

This claim was first raised in Breedlove's second 1991 post-conviction proceeding and was based on penalty-phase counsel's affidavit stating that he was forced to handle the penalty phase immediately after the verdict in the guilt phase, with only a weekend to prepare. Although the trial judge had summarily denied this claim, the Florida Supreme Court believed that Breedlove's allegations were sufficient to warrant an evidentiary hearing, so it remanded the case for a hearing. *Breedlove III,* 595 So.2d at 11.

***The Evidentiary Hearing.*** The evidentiary hearing conducted by the trial judge was extensive, as described by the Florida Supreme Court:

At the postconviction hearing, the court heard testimony from the three assistant public defenders who represented Breedlove, from family members and friends of Breedlove, from three psychologists who had examined Breedlove for the defense, and from a psychiatrist who had testified for the State. Finger and Levine testified that Levine was hampered in preparing for the penalty phase by the trial court's denial of a time extension between the end of the guilt phase and the beginning of the penalty phase. Levine testified that he had never before handled representation in a first-degree murder trial. Levine further testified that because the responsibility for the penalty phase was "thrust upon [him] on a Friday afternoon," the resulting lack of preparation caused him to "not present effective assistance of counsel." This confession of ineffectiveness because of lack of preparation was somewhat contradicted by the record, which reflects evidence that Levine had handled the representation of Breedlove in motions directed to the penalty phase in advance of the trial. In addition, Zenobi testified that he had been present during the penalty phase and that Levine was an excellent lawyer. Of the three psychologists who testified for the defense at the postconviction hearing, only two had testified at the original penalty phase. Both of those psychologists testified that even with the additional information provided to them in preparation for the postconviction hearing, the opinions to which each had testified at the penalty phase would have been the same. The third psychologist the defense presented at the postconviction hearing had examined Breedlove shortly before the hearing and also had reviewed background information concerning Breedlove. This psychologist testified that Breedlove had longstanding mental health impairments and that in the psychologist's opinion, they existed at the time of the offense in 1978. This third psychologist further testified that he did not agree with the opinions expressed by psychologists who had testified at the penalty phase on behalf of the State and that he doubted that those opinions could have been formed reliably based on information the State psychologists had at the time they expressed their opinions. At the postconviction hearing, the State presented the testimony of a psychiatrist who had testified at the penalty phase. The psychiatrist testified that his opinion expressed in 1979 that Breedlove was a sociopath and that Breedlove was not under extreme mental duress or influence at the time of the offense would be the same as his opinion expressed at the postconviction hearing. The defense had presented a psychiatrist's testimony at the penalty phase, but he was not a witness at the postconviction hearing.

None of the friends and family members who testified at the postconviction hearing had testified at the penalty phase. These lay witnesses testified that Breedlove's father had beaten Breedlove often during his childhood, that Breedlove's mother was an alcoholic, and that Breed-

love was addicted to drugs and exhibited violent behavioral changes when he was on drugs. On cross-examination, the State presented evidence that Breedlove's father had been and still was a hard-working man, that some of Breedlove's siblings were gainfully employed and had been convicted of no crimes, and that Breedlove previously had been convicted of two rapes in California and a murder and a burglary in Broward County, Florida.

The trial court in the postconviction hearing applied both prongs of the ineffectiveness-of-counsel test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in addressing Breedlove's claim that his counsel was ineffective during the penalty phase. As to the first prong, deficient performance by the attorney, the court found that Levine was not deficient in any way in representing Breedlove during the penalty phase. The court also addressed the second prong as to prejudice resulting from the attorney's performance. Regarding this second prong, the court found:

It is this Court's opinion that there is no reasonable probability that the outcome would have been different. After hearing testimony of the additional witnesses presented during the evidentiary hearing, this Court is convinced that there is no merit to this argument. This conclusion was arrived at by considering whether or not these additional witnesses and their testimony concerning alleged child abuse of the defendant, considered as a mitigating circumstance could have overcome the aggravating circumstances submitted by the state during the original penalty phase. This Court finds that although mitigating circumstances were not proved by a preponderance of the evidence that were they to be considered as a mitigating circumstance, that the aggravating cir-

cumstances outweighed this mitigating circumstance.

692 So.2d at 875–76.

***The Supreme Court of Florida's Finding of No Prejudice.*** In reviewing Breedlove's 3.850 motion concerning his ineffective assistance of counsel at penalty phase claim, the Florida Supreme Court focused on the issue of prejudice, assuming, without deciding, that Breedlove's counsel's claim of deficient performance was true. *Id.* at 877. Several facts led it to disagree with Breedlove's argument that the result would have been different but for counsel's alleged deficient performance. First, the Supreme Court considered that both psychologists who testified at the penalty phase testified during the postconviction hearing that even considering the additional information, their opinions were unchanged. *Id.* at 877. Second, the court noted that two state experts stated that they found no evidence of organic brain damage or psychosis and one of them said Breedlove was malingering. *Id.* Third, the court found that the failure to present mitigating evidence in the form of testimony from friends and family members did not meet the prejudice standard. If witnesses had testified concerning Breedlove's drug addiction or beatings by his father, these witnesses would have been subject to cross-examination and rebuttal evidence could have been presented concerning matters such as the petitioner's violent nature. For example, the Supreme Court noted that the state had wanted to introduce rebuttal evidence that Breedlove had confessed to a similar murder in Broward County. At the time of the original trial, however, Breedlove had not yet been convicted of this crime. Because Breedlove presented no evidence of his character, the trial court excluded the evidence because the danger of unfair prejudice to the defendant outweighed its probative value. *Id.* at 878 n. 4.[9] Additionally, the

9. Presentation of these witnesses would have given the state repeated opportunity to elicit other damaging evidence concerning Breedlove or the defense theory. Another example

is that family friend, Clifford Bell, testified that when Breedlove was on drugs, he was scary and violent and Bell would not have been surprised if Breedlove committed a mur-

supreme court noted that even if the trial court had considered the mitigating circumstances testimony of Breedlove's family and friends, the aggravating factors found by the trial court—that the crime was especially heinous, atrocious, or cruel—would have overwhelmed the potential mitigating factors. In light of these factors, the Florida Supreme Court found that there was no reasonable probability that the outcome would have been different but for the deficient performance of counsel. *Id.* at 878.

***Petitioner's Right to an Evidentiary Hearing Under § 2254(e)(2).*** As detailed above, the petitioner received an exhaustive evidentiary hearing on this claim in the state court. Pursuant to section 2254(e)(2), the petitioner is not now entitled to another evidentiary hearing. *See Neelley v. Nagle,* 138 F.3d at 921 (no evidentiary hearing conducted on ineffective assistance of counsel claim in district court where one was conducted in the state court); *see also, Keeney v. Tamayo–Reyes,* 504 U.S. 1, 10, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992)(petitioner must afford the state a full and fair opportunity to address and resolve his claim on the merits). Moreover, the state courts' findings of fact from the evidence presented at said hearing are entitled to a presumption of correctness; it is the petitioner's burden to rebut this presumption with "clear and convincing"evidence. § 2254(e)(1); *see also Bolender v. Singletary,* 16 F.3d at 1572, n. 9. This court has reviewed the testimony presented at the evidentiary hearing and finds that the state court's conclusions were well supported, and there is no "clear and convincing evidence" to rebut the presumption of correctness.

***Neelley Analysis.*** The established precedent from the United States Supreme Court applicable to this claim is *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Florida courts reviewed Breedlove's ineffective assistance of counsel claim under a *Strickland* analysis. Although the trial court

considered both prongs of the *Strickland* test, the Florida Supreme Court assumed, without deciding, that counsel's performance was deficient and applied only the prejudice prong of *Strickland* which requires Breedlove to show that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 669, 104 S.Ct. at 2053–54. Having applied the correct standards, the Florida Supreme Court found, for the reasons stated above, that counsel's alleged deficient performance in failing to present mitigating evidence did not result in prejudice which meets the prejudice prong of the *Strickland* analysis. This court finds that the Florida courts rulings were in accordance with the prejudice standards set forth in *Strickland:*

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland,* 466 U.S. at 695–96, 104 S.Ct. at 2068–69. Moreover, the Florida Supreme Court applied the appropriate legal stan-

der when he was on drugs. (App. 4 at 973, 976–79).

dards of a case that is factual similar to this case. In *Strickland,* the Court held that defense counsel's failure to present psychological evidence which would have been countered by the state experts, and failure to present character witnesses which would have opened the door to the state's presentation of additional prior criminal history at the penalty phase, was not deficient conduct and did not result in any prejudice to Breedlove. 466 U.S. 668, 104 S.Ct. at 2070–71. In light of the similarity of *Strickland's* facts to this case, the Florida Supreme Court's decision can not be said to be unreasonable. *See also Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(admission of mitigation evidence bears risk of opening door to unfavorable rebuttal); *White v. Singletary,* 972 F.2d 1218, 1225 (11th Cir.1992)(no ineffectiveness or prejudice in failing to present witness who would have testified to mitigating circumstances where witnesses would have opened door for state to explore defendant's violent tendencies); *Lusk v. Dugger,* 890 F.2d 332, 338 (11th Cir.1989)(petitioner did not show a reasonable probability that the result would be different if evidence relative to his childhood had been introduced where it was entirely possible jury would have considered background evidence as aggravating rather than mitigating).

Additionally, the sentencing judge found, and the Florida Supreme Court agreed, that even if the lay testimony was accepted as mitigation, the aggravating factors in this case would still overwhelm any mitigation. "[A] federal habeas corpus court will not re-evaluate the weight accorded to particular aggravating and mitigating factors. This determination is left to state courts, providing the death penalty statute and sentencing hearings meet relevant constitutional requirements." *Magwood v. Smith,* 791 F.2d 1438, 1449 (11th Cir.1986) Under the circumstances, the petitioner has not shown prejudice. *See Card v. Dugger,* 911 F.2d 1494, 1521 (11th Cir.1990)(habeas relief not warranted where sentencing judge made it

clear that even if mitigation were found, mitigating factors would not outweigh overwhelming evidence of aggravating circumstances under Florida law).

## Claim VI: The Florida Supreme Court's Holding on the "Heinous, Atrocious, and Cruel" Aggravating Factor

Petitioner contends that he is entitled to a new sentencing because the jury's death recommendation was tainted by Eighth Amendment error due to constitutionally inadequate jury instructions regarding the "heinous, atrocious or cruel" aggravating factor. He also asserts that the Florida Supreme Court used the wrong standard of review when, in *State v. Breedlove,* 655 So.2d 74 (1995), it considered his claim for post-conviction relief on this issue.

*Facts:* At trial, the judge found the following aggravating circumstances existed: (1) Breedlove had prior convictions for crimes of violence; (2) Breedlove committed the homicide during the course of a burglary; and (3) the homicide was especially heinous, atrocious, and cruel. On direct appeal, Breedlove argued that the trial court erred in failing to give his requested expanded instruction on the heinous, atrocious and cruel aggravator. The Florida Supreme Court rejected his claim. *See Breedlove I.* In 1992, Breedlove appealed the denial of his second motion for post-conviction relief and filed a petition for habeas corpus which raised, in part, the unconstitutionality of the instruction on the heinous, atrocious, or cruel aggravator and the wrongful application of this aggravator to his case. The supreme court found that Breedlove's arguments regarding the instruction had already been fully considered on direct appeal and therefore were procedurally barred. *See Breedlove v. Singletary,* 595 So.2d 8, 10 (Fla.1992).

Subsequently, the United States Supreme Court issued *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), which considered the constitutionality of the same jury instruction on

heinous, atrocious, or cruel that was given at Breedlove's trial, and held that it violated the due process clause. Breedlove filed a motion for post-conviction relief predicated on *Espinosa.* The trial court hearing the post-conviction claim ruled in Breedlove's favor, holding that Breedlove was entitled to a new sentencing hearing because the court could not determine beyond a reasonable doubt whether the jury would still have recommended the death penalty if the expanded instruction had been given. The state appealed. In *State v. Breedlove,* 655 So.2d 74 (1995), the Florida Supreme Court reversed the trial court, holding that the failure to give the requested instruction was harmless because the evidence presented at trial clearly established that Breedlove committed the murder in a heinous, atrocious, or cruel manner. The court wrote as follows:

> The fatal stabbing was administered with such force that it broke the victim's collar bone and drove the knife all the way through to the shoulder blade. The puncture of the victim's lung was associated with great pain and the victim literally drowned in his own blood. The victim had defensive stab wounds on his hands and did not die immediately. Moreover, the attack occurred while the victim lay asleep in his bed as contrasted to a murder committed in a public place. In fact, in discussing this aggravator in Breedlove's direct appeal, we stated that this killing was "far different from the norm of capital felonies" and set apart from other murders. Under the facts presented, this aggravator clearly existed and would have been found even if the requested instruction had been given. Further, there were two other valid aggravating circumstances, including the previous conviction of a violent felony. While Breedlove presented some testimony concerning possible psychological problems, two state experts expressly stated that they found no evidence of organic brain damage or psychosis and

one of them said Breedlove was malingering. Any error in the instruction was harmless beyond a reasonable doubt and did not affect Breedlove's sentence. 655 So.2d at 76 (citations omitted).

■ In claim VI of his habeas petition, Breedlove argues that the instruction on heinous, atrocious or cruel given at this trial was unconstitutionally vague, citing *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). As noted in *Davis v. Singletary,* 119 F.3d 1471, 1477–83 (11th Cir.1997), however, such claims are foreclosed on federal habeas review, regardless of whether they have "merit." This is because the claim is dependent on the application of *Espinosa* to petitioner's advisory jury sentencing. The United States Supreme Court has ruled that *Espinosa* was not clearly established law at the time of petitioner's trial. *Lambrix v. Singletary,* 520 U.S. 518, 528, 117 S.Ct. 1517, 1525, 137 L.Ed.2d 771 (1997). To the contrary, *Espinosa* announced a "new rule" which, under the authority of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), could not be applied retroactively as basis for federal habeas relief.[10] *Id.* Consequently, Breedlove is not entitled to the benefit of the rule announced in *Espinosa. See Glock v. Singletary,* 65 F.3d 878 (11th Cir.1995).

Petitioner also asserts that the Florida Supreme Court used the wrong standard when it evaluated his post-conviction claim concerning the "heinous, atrocious, and cruel" instruction. He argues that in making its harmless error determination, the Florida Supreme Court applied a sufficiency-of-the-evidence standard, rather than requiring the state to prove that any error was harmless beyond a reasonable doubt, in violation of *Chapman v. State,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On review of the Florida court's opinion in *State v. Breedlove,* 655 So.2d 74 (1995), as set forth above, this court does not agree

**10.** In *Teague,* the Court stated that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. at 310, 109 S.Ct. at 1075.

that the Florida court limited itself to a sufficiency-of-the-evidence standard. To the contrary, the standard of review used by the Florida Supreme Court was in accordance with the approach set forth in *Chapman*, that is, "any error in the instruction was harmless beyond a reasonable doubt and did not affect Breedlove's sentence." *Breedlove*, 655 So.2d at 77. *See Chapman*, 386 U.S. at 24, 87 S.Ct. 824 ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). Accordingly, Breedlove is not entitled to habeas relief on this claim.

### Claim VII: That Electrocution Constitutes Cruel and Unusual Punishment in Violation of the Eighth Amendment.

 Breedlove argues that the manner and conditions in which the State of Florida propose to carry out his death penalty violate the Eight Amendment. He seeks an evidentiary hearing on this issue. But Breedlove never attempted to raise this issue at his trial, on direct appeal, in any of his three Rule 3.850 motions, on appeal of those motions, or in his state habeas corpus petition to the Florida Supreme Court. Perhaps he did not raise the issue because the Supreme Court of Florida has consistently held that Florida's use of the electric chair is constitutional and that electrocution is not cruel and unusual punishment.[11] *See Provenzano v. State*, 739 So.2d 1150 (Fla.1999); *Jones v. State*, 701 So.2d 76 (Fla.1997)[12], cert. denied, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998), *Remeta v. State*, 710 So.2d 543 (Fla.1998). In any event, the petitioner's claim, that electrocution is unconstitutional, was not "fairly presented" to the Florida courts and is unexhausted. The general rule is that a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. § 28 U.S.C. 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that … the applicant has exhausted the remedies available in the courts of the State….").

"Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir.1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391–92, 77 L.Ed.2d 1090 [1983] ). An attempt at exhaustion would be futile, however, because Breedlove's conviction and sentence became final in November 1982. Thus the claim would now be untimely and procedurally barred in the state court. *See* Fla.R.Crim.Pro. 3.850 (post-conviction proceedings in capital cases may not be initiated more than a year after the conviction becomes final or after facts were or should have been known to defendant); see also *Remeta*, 710 So.2d at 544 (trial court summarily rejected claim that electrocution is cruel or unusual punishment as procedurally barred);. Accordingly, the claim, now barred by state law, forms no basis for federal habeas relief. *See Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991); *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir.1999)(habeas corpus petitioner who fails to raise his federal claims properly in state court is procedurally barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default, citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

In this case, petitioner has failed to show cause for the default; all aspects of this claim have been available for years. Thus, this court will not review the merits of this procedurally barred claim. *See Stewart v. LaGrand*, 526 U.S. 115, 119

---

11. The Eleventh Circuit has also rejected the claim that death by electrocution is cruel and unusual punishment. *See e.g., Felker v. Turpin*, 101 F.3d 95, 97 (11th Cir.1996).

12. Breedlove sought to intervene in the *Jones* case, but his request was denied by the Florida Supreme Court.

S.Ct. 1018, 143 L.Ed.2d 196 (1999)(habeas petitioner convicted of capital murder could not show cause for failing to raise on direct appeal claim that execution by lethal gas violated Eighth Amendment's prohibition of cruel and unusual punishment, as required to overcome procedural bar in habeas proceeding; constitutionality of lethal gas executions was being debated at time of direct appeal, and several states were reconsidering use of that method of execution immediately prior to the appeal).

No evidentiary hearing is authorized on this issue because the claim was never presented to the state courts. 28 U.S.C. § . 2254(e)(2); *see also, Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (AEDPA's provisions do not authorize the grant of an evidentiary hearing in federal habeas court where the claim was not first fairly presented to the state courts).

### Claim VIII: Penalty Phase Closing Argument

■ In claim VIII, Breedlove contends that during the penalty phase closing argument, the prosecutor made several inflammatory and prejudicial comments that deprived him of a fair trial. One of the allegedly improper comments suggested that the murder may have been committed during a burglary with intent to commit sexual battery, instead of burglary with intent to steal.[13][14] Defense counsel objected to this argument at trial. The second and third instances of improper comment related to the prosecutor's argument concerning mental health mitigation and the role of the legislature. No objection was raised on either of these argument at trial. Breedlove asserts that appellate counsel's failure to raise these issues on direct appeal constituted ineffective assistance of counsel.

Breedlove initially raised the second and third ineffectiveness arguments in his habeas petition to the Florida Supreme Court. In *Breedlove III,* 595 So.2d at 10, the supreme court found that these ineffectiveness claims to be procedurally barred, writing, "[h]abeas corpus is not a second appeal and cannot be used to litigate or relitigate issues which could have been, should have been, or were raised on direct appeal." *Id.* The fourth allegedly improper comment, improper argument of

---

**13.** Although Breedlove had not been charged with sexual battery, the prosecutor relied on the following evidence in making this argument. At the guilt phase, the evidence showed that Breedlove had looked through the window, had seen a woman's purse, and therefore knew that a woman was in the house when he broke in. After breaking in, Breedlove had armed himself with a knife and had proceeded to the bedroom where the woman was sleeping. At the penalty phase, the state had presented evidence of Breedlove's prior rapes. The defense presented mental health evidence which elicited that petitioner was a mentally disordered sex offender.

**14.** The intent to commit sexual battery comment occurred when the prosecutor was discussing the aggravating factor, which is set forth at section 921.141(5)(d), Florida Statutes as follows:

> The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual

battery, arson, burglary, kidnaping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

After the prosecutor read the statute to the jury, he suggested that the murder was committed during a burglary with intent to commit sexual batter, instead of a burglary with intent to steal, stating:

> Clearly we know that the defendant was engaged in the act of burglary. Whether or not he was engaged in the act of attempting a sexual battery on Carol Meoni we do not know, because he was surprised by Mr. Budnick inside the bedroom. What would have happened had he not been surprised, based upon what he did in the bedroom—
>
> MR. LEVINE: Objection and reserve the right to make motions.
>
> THE COURT: All right, sir.
>
> MR. STELZER: I point this out for a specific reason which I will tell you in a minute. As to whether he was engaged in just a burglary or as to whether he was engaged in a sexual battery, we do not know. We will get to that in a minute.
>
> MR. LEVINE: Objection. (R. 1427–28).

non-statutory factors, was raised on direct appeal. The Florida Supreme Court found "[w]hile these remarks may have stretched the bounds of proper argument, Breedlove does not appear to have been prejudiced because the court did not find them in aggravation." *Breedlove I*, 413 So.2d at 9.

*Neelley Analysis.* Petitioner asserts that the clearly established law on the ineffectiveness claim is *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[15] He asserts that *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), *Ford v. Georgia*, 498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); and *James v. Kentucky*, 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984), are also relevant to this issue because they stand for the proposition that a procedural bar must not be applied inconsistently and sporadically.

This court finds that it need not reach the procedural bar issue. Applying the clearly set precedent set forth in *Strickland*, this court finds that appellate counsel was not ineffective in failing to raise the sexual battery issue on direct appeal. Assuming, for the sake of argument, that the evidence did not support a good-faith basis for this line of argument, there simply was no prejudice. The sexual battery alternative, which is normally included the section 921.141(5)(d), "in the course of a felony" charge, was deleted from the charge given to the jury in this case. (App.1, R. 175). Thus the jury was not permitted to consider the sexual battery factor. Moreover, the trial judge found the burglary as the felony aggravator, rather than sexual battery. (App.1, R. 185). Consequently, appellate counsel was not ineffective in failing to raise this issue on direct appeal because there was no prejudice.

Similarly, the court finds no merit in the ineffectiveness arguments raised with re-

spect to the prosecutor's comments concerning the statutory mental health mitigating factors and the legislature. Trial counsel raised no objection to this argument. As such, appellate counsel was not ineffective in failing to raise these issues because the alleged error was not preserved at trial. *See Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir.1990)(appellate counsel cannot be ineffective where the issue was not properly preserved at trial).[16]

Nor do the prosecutor's comments on the non-statutory factors constitute grounds for habeas relief. The jury was instructed that it could consider only statutory aggravators, and the judge found no non-statutory factors. Thus the Florida Supreme Court properly resolved this issue on the grounds of lack of prejudice. *See Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir.1983)(petitioner not entitled to relief for claim that prosecutor's closing remarks were introduced for jury consideration nonstatutory aggravating circumstances. The judge properly instructed the jury, however, that it could consider only the aggravating circumstances listed in the statute. A jury is presumed to follow jury instructions.) *See Grizzell v. Wainwright*, 692 F.2d 722, 726–27 (11th Cir.1982). The state court's resolution of said claims thus can not be deemed "unreasonable" within the meaning of *Neelley v. Nagle.*

### Claim IX: The Prosecutor's Guilt–Phase Closing Argument

Petitioner argues that the prosecutor's closing argument at the guilt phase was also rife with improper and prejudicial comments. The Florida Supreme Court did not deem these comments to be improper when the issue was raised on direct appeal. It disagreed that the prosecutor's

---

**15.** Breedlove does not seek an evidentiary hearing on this issue as it may be determined as a matter of law.

**16.** To the extent that Breedlove asserts that trial counsel was ineffective in failing to ob-

ject at trial, the supreme court properly found that this ineffectiveness claim was procedural barred in a habeas proceeding because it should have been brought in rule 3.850 motions. *See Breedlove III*, 595 So.2d at 10.

"vituperative" characterization of Breedlove exceeded the bounds of proper comment.

> The prosecutor characterized the killing as a 'savage and brutal and vicious and animalistic attack'; he did not refer to Breedlove as an 'animal'.

*Breedlove I,* 413 So.2d at 8. It held that the prosecutor's comment on the ability to be safe in one's home was not so prejudicial to require a new trial.

> The prosecutor said: "When we walk the streets we take our chances." In response to an objection the court said: "Stay on the evidence in this case." The prosecutor then said: "One place in the world where we ought to be free from this kind of violence, this kind of crime, is in our own home." The court overruled an objection to this remark. These comments appear to reflect common knowledge and are probably the sentiments of a large number of people. They do not appear to be out of place.

*Breedlove,* 413 So.2d at 8.

■ *Neelley Analysis* Petitioner asserts that the clearly established law from the Supreme Court at the time of the state court's adjudication was that a prosecutor can deprive a defendant of a fair trial by improper and inflammatory argument. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (conviction cannot stand if error "so infected the trial with unfairness as to make the resulting conviction a denial of due process."). After a review of the record, this court finds that the characterization of the brutal knife attack did not "infect the trial with unfairness." Given

the nature of the injuries inflicted on the victim, it was a fair comment on the evidence, and does not provide grounds for habeas relief. *See Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. 2464 (habeas relief denied even when the defendant himself was referred to as an animal). Nor is the comment about the ability to be safe in one's home grounds for habeas relief in this case.

The petitioner was charged with burglary of a dwelling so the facts supported a reference to the petitioner's presence in the victim's home and, under the circumstances, the comment was not so unconstitutionally prejudicial as to make the resulting sentence of death a denial of due process. When viewed in the context of the entire record, the comment was relatively isolated, particularly in light of the prosecutor's lengthy closing argument. *See Bertolotti v. Dugger* 883 F.2d 1503, 1540 n. 19 (11th Cir.1989)("we agree with the district court's conclusion that the comments considered cumulatively or individually, did not deny Bertolotti a fair trial.").

■ Petitioner also cites as error the prosecutor's comments with respect to the defense's failure to produce the Gibsons and certain police reports. These comments, however, were not improper because they were made in direct response to the defense counsel's own "where are the Gibson's?" closing argument.[17] Invited comments which do no more than respond to defense counsel's challenge do not warrant habeas relief. *See U.S. v. Young,* 470 U.S. 1, 17, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).[18]

---

17. In closing, defense counsel made the following argument:

> They had to hook up somebody in the house. There are six adults living in that house. You heard the statements about Mary and Elijah Gibson. Where were they? Where were those people? Did the State bring them in? Of course not, because what they would have had to bring in were two more suspects, and the only people you saw in here were the detectives.

> Who would have been better than to bring in Mary and Elijah Gibson and say, "We heard this, we saw that on that night."
> Would you not have wanted to see them? Again, a lack of evidence. (App.1, T. 1152).

18. To the extent that Breedlove may be asserting an ineffectiveness claim with respect to appellate counsel's failure to raise this issue on appeal, the court finds that counsel cannot be found deficient for failing to present this

### Claim X: Hearsay Testimony at the Penalty Phase

In his state habeas petition to the Florida Supreme Court, Breedlove, for the first time, alleged that his appellate counsel was ineffective for not raising the issue of the improper admission of hearsay testimony during the penalty phase of the trial. That argument was rejected, however, by the Supreme Court of Florida, which found that appellate counsel was not ineffective. *Breedlove III,* 595 So.2d at 10.

*Facts:* At the penalty phase of the trial, the state offered the testimony of Officer Blishak of the Los Angeles Police Department to establish the aggravating circumstance of Breedlove's conviction of a prior violent felony. Blishak, who was not only the lead detective on the case, but also an eye witness to the crime, testified concerning his observations.

Q. [By the prosecutor] What if anything of an unusual nature did you hear?

A. I heard a woman's voice emanating from the building right next to where I was.

I heard moaning, and I heard the voice saying something to the effect of, "You are hurting me."

Q. All right, sir. Did you and your partner have occasion to go investigate what the source of this noise was?

A. I did. My partner was on the other side of the building.

Q. Would you tell the members of the jury, please, in your own words, what happened when you went to investigate the source of this noise.

A. I entered the first-floor hallway of the building and walked about halfway down the hall to apartment five, which was the apartment number given to me on the radio call, and it was also in the same location from which I had heard the noise.

The door was ajar, and I walked inside the apartment room, and I saw the defendant straddling a woman who was lying on her back on a bed with her nightgown pushed up around her neck area.

Q. What was this woman's name?

A. Hedda Schuhbaum.

Q. How old was Miss or Mrs. Schuhbaum? Miss or Mrs.

A. Miss.

Q. How old was Mrs. Schuhbaum?

A. Early thirties. I don't recall exactly the age.

Q. What did you see the defendant doing, if anything, when he was straddling Miss Schuhbaum?

A. His zipper was down and his penis was exposed. He had one hand clutching her neck, and the other one was on a pillow, which was on the woman's face.

He was leaning down. He appeared to be straddling her and pushing down on her face with the pillow.

Q. All right, sir. After you encountered the defendant straddling this woman or appearing to be straddling this woman, what if anything did you do?

A. I told him to get off her.

Q. What if anything did the defendant do at that point?

A. He jumped off her and came at me.

Q. What if anything did you do at that point when he came at you?

A. I backed off a step. He hit at my gun. I had my gun out. He hit at it with the pillow, which he had brought off the bed with him.

I backed off a little more. He kept coming, so I shot him.

(App.1, T. 1294–96).

Sgt. Blishak was then asked what the victim told him. Defense counsel's hearsay objection was overruled, and Blishak stated:

A. She said she heard a noise by her window which on the west side of her apartment building, and she felt a prowl-

unpreserved issue. *See Card,* 911 F.2d at 1520.

er was there, someone was trying to get in.

So she called the police. She then said that a few minutes after that, she heard a tap at her door. She thought the police had arrived and were at the door so she opened it.

It wasn't the police though. It was the defendant. She told me that he pushed her down on the bed and began choking her and that she was falling unconscious.

She told me she was convinced she was going to die, and that she was awakened by the sound of the shot.

Q. Did she mention whether she had ever seen this person before?

A. She told me she had never seen him before.

***Florida Supreme Court's Determination.*** In his state habeas petition, Breedlove argued that Officer Blishak offered prejudicial hearsay evidence in violation of *Rhodes v. State*, 547 So.2d 1201 (Fla.1989), and that appellate counsel was ineffective in failing to raise this issue on direct appeal. The state responded that appellate counsel was not ineffective because there was no error in admitting the testimony. Florida's capital sentencing statute, section 921.141(1), Florida Statutes, permits the presentation of hearsay evidence during the penalty phase if the defendant is "accorded a fair opportunity to rebut any hearsay statements." The state contended that the defendant was given a full opportunity to rebut the officer's testimony. The Supreme Court of Florida agreed with the state.

Breedlove has not met the substandard performance and prejudice test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and his reliance on *Rhodes v. State*, 547 So.2d 1201 (Fla.1989), is misplaced. In *Rhodes* we held that playing a tape recording of the victim's recounting the crime was error because Rhodes could not cross-examine that recording. Here, however, the witness was available for cross-examination. If this issue

had been raised on direct appeal, we would have found it to have no merit, and appellate counsel is not ineffective for not raising non meritorious issues. *Cf. Roberts v. State*, 568 So.2d 1255 (Fla. 1990); *Bolender v. Dugger*, 564 So.2d 1057 (Fla.1990). Therefore, we deny the petition for habeas corpus.

595 So.2d at 10.

In this federal habeas petition, Breedlove has not requested an evidentiary hearing on Claim X, agreeing that the claim can be resolved as a matter of law.

***Neelley Analysis.*** As noted by the state court, the established precedent with respect to ineffectiveness claims is *Strickland v. Washington*. *See Breedlove III*, 595 So.2d at 10. Breedlove argues that his Sixth Amendment right to confrontation is also implicated in this issue, therefore, the Supreme Court's opinion in *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), which establishes the law on the right to confrontation, must also be considered. According to Breedlove, the Florida Supreme Court unreasonably applied *Pointer* and *Strickland*.

As quoted above, the Florida Supreme Court held that appellate counsel was not deficient and no prejudice was demonstrated because the officer, who had witnessed the crime himself, was subject to full cross-examination. His testimony therefore did not constitute impermissible hearsay. *Id. See also Damren v. State*, 696 So.2d 709 (Fla.1997)(defendant received fair opportunity to rebut hearsay statements of accomplice, who had since been killed, which were admitted during penalty phase, through opportunity to cross-examine witnesses who testified as to statements).

Although Breedlove argues that the Florida court's ruling infringed on his constitutional right to cross-examine witnesses, he fails to cite any case which requires a finding that Florida's capital sentencing statute, section 921.141(1), is unconstitutional because it permits hear-

say testimony at the sentencing phase of a capital case. A review of Supreme Court case law supports the conclusion that there is no Sixth Amendment right to cross-examine all out-of-court sources of information at the sentencing phase. *See Williams v. People of State of New York,* 337 U.S. 241, 250, 69 S.Ct. 1079, 1084–85, 93 L.Ed. 1337 (1949)(issue in trial before verdict is whether defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused, but a sentencing judge is not confined to the narrow issue of guilt and his task within fixed statutory or constitutional limits is to determine type and extent of punishment after the issue of guilt has been determined, and in thus determining sentence the fullest information possible concerning the defendant's life and characteristics is relevant.); *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)(in considering a sentence, the trial judge may conduct a broad inquiry which is "largely unlimited either as to the kind of information he may consider, or the source from which it may come."). In this case, the officer was an eye witness to the crime and, under the circumstances, his testimony bore sufficient indicia of reliability that it did not violate Breedlove's right of confrontation.

■ Additionally, even if there was error in permitting the officer's hearsay testimony to come in, the state court's finding of no prejudice is particularly appropriate in this case because Blishak's brief description of the victim's account is consistent with, and considerably less colorful than, the officer's own eyewitness account. Accordingly, this court cannot say that the state court's conclusion was unreasonable.

### Claim XI: Instruction on the Aggravating Circumstance of Flight

■ At the penalty phase of the trial, the court instructed the jury as follows on the aggravating circumstance of flight. "The aggravating circumstances which you may consider are limited to such of the following as may be established by the evidence...E, that the crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing lawful arrest or affecting an escape from custody."(R. 1459–1460). Petitioner argues that this instruction was error and deprived him of a fair trial because no evidence was adduced at trial indicating that the crime was committed to avoid arrest. *See Wright v. State,* 586 So.2d 1024, 1030 (Fla.1991)(under Florida law, an instruction on flight is permissible only when evidence is presented to support it).

Petitioner first raised this claim in his state habeas corpus petition. The Florida Supreme Court found the claim procedurally barred because it could and should have been raised on direct appeal. *Breedlove,* 595 So.2d at 10. Petitioner did not allege any cause for his default; there were no allegations of ineffective assistance of trial or appellate counsel.

***Neelley Analysis:*** Breedlove does not ask for an evidentiary hearing on this claim because it involves only a matter of law. He asserts that the clearly established law to be applied in this claim was set forth in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)(death sentence was not infirm on ground that the jury instruction with regard to the invalid circumstance may have unduly affected jury deliberations as evidence was otherwise admissible under state law), and *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)(a procedural bar must not be applied inconsistently and sporadically). But he does not explain how the Florida court's holding on this matter was contrary to these cases.

In this case, the trial court's instruction on flight is not grounds for federal habeas relief because this claim was procedurally defaulted; the state court held that petitioner's argument was barred pursuant to a state procedural rule, and petitioner failed to demonstrate cause or prejudice for his failure to raise those claims on direct review. *See Stewart v. LaGrand,*

526 U.S. 115, 119 S.Ct. 1018, 143 L.Ed.2d 196 (1999)(habeas petitioner's claim was procedurally defaulted where state court had ruled that his ineffective assistance arguments were barred pursuant to a state procedural rule, and petitioner failed to demonstrate cause or prejudice for his failure to raise those claims on direct review).

Significantly, apart from failure to establish cause, petitioner has failed to demonstrate prejudice. The trial judge did not find the flight aggravator applicable. Consequently, Breedlove has shown no grounds for habeas relief on this claim.

### Claim XII: Majority Vote for Life Recommendation

■ In his twelfth claim, petitioner asserts that the trial court erroneously instructed the jury that a life recommendation had to be made by a majority vote. Defense counsel did not object. Petitioner asserts that trial counsel's failure to object was ineffective assistance of counsel.

Florida's death penalty statute requires the jury to make a recommendation on the sentence to be imposed on a convicted capital defendant, but is silent with respect to whether the recommendation must be unanimous or by a majority vote. *See* § 921.141(3), Fla. Stat. The Florida Supreme Court, however, has established that a recommendation for death by a majority vote is permissible. *Alvord v. State,* 322 So.2d 533 (1975). On the other hand, a majority vote is not required for a life recommendation. *See e.g., Bush v. Singletary,* 988 F.2d 1082, 1089, (11th Cir.1993)(under Florida's capital sentencing scheme, if a majority does not vote for death, the jury's recommendation is life; therefore, if the jury's vote is six to six, the recommendation is one for life).

Breedlove's jury was instructed that to recommend either life or death, its vote had to be by a majority of the jury.

Now, in these proceedings, it is not necessary that the verdict of the jury be unanimous, but a verdict may be rendered upon the finding of a majority of the jury. The fact that the determina-

tion of whether or not a majority recommend a sentence of death or a sentence of life imprisonment in this case can be reached by a single ballot should not influence you to act hastily or without due regard to the gravity of these proceedings.

(R. 1464).

On the other hand, if after considering all the law and evidence touching upon the issue of punishment, a majority of the jury determine that the defendant should not be sentenced to death, then you should render an advisory sentence as follows: "We, a majority of the jury, at Miami, Dade County, Florida, this blank day of March, 1979, recommend that the Court impose the sentence of life imprisonment, as authorized by Florida Statute 775.082, paragraph (1), so say the majority," signed by one of your number as foreman. The law requires that seven or more members of the jury agree upon any recommendation advising either the death penalty or life imprisonment.

(R. 1465).

Defense counsel never objected to this error. Breedlove contends that counsel's failure to object was ineffective assistance of counsel. Although the ineffectiveness claim was raised in petitioner's state habeas petition, the Supreme Court of Florida rejected the claim on the ground that claims of trial counsel ineffectiveness must be raised in Fla. R.Crim. P. 3.850 proceedings, not state habeas petitions. *Breedlove,* 595 So.2d at 10; *see also Stephenson v. State,* 655 So.2d 86, 87 (Fla.1995)(it is well settled that claims of ineffective assistance of trial counsel, with rare exceptions, are cognizable only by rule 3.850 and may not be raised by a petition for habeas corpus before an appellate court).

*Neelley Analysis.* Breedlove does not request an evidentiary hearing on this claim as only a legal issue is involved. Because the Florida Supreme Court found the claim to be procedurally barred, petitioner contends that the clearly established

law on the issue is *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

 Under Florida law, if the petitioner attempted to raise this issue again in the correct manner in state court, by Rule 3.850, the claim would now be procedurally barred because claims that are cognizable under Rule 3.850 in capital cases must be raised within a year after the conviction becomes final, or after the facts were or should have been known to the defendant. Breedlove's conviction and sentence became final on November 29, 1982, so clearly more than a year has passed since his conviction became final. He cannot contend that he recently became aware of the facts relevant to this claim because the claim is based on the trial record. When a claim has not been exhausted in the state courts but would be barred if it were presented there, a federal court may rely upon the applicable state rules and bar the claims, since exhaustion would be futile. *See Teague v. Lane,* 489 U.S. 288, 297–299, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Tower v. Phillips,* 7 F.3d 206 (11th Cir. 1993); *Parker v. Dugger,* 876 F.2d 1470 (11th Cir.1989). As such, this claim is barred on federal habeas review.

Moreover, no prejudice has been demonstrated as there is no evidence showing that the jury was divided and could not reach a majority verdict; the record reflects that the majority of the jury in fact voted for death. *See Bush v. Singletary,* 988 F.2d 1082, 1089, (11th Cir.1993) (Absent some evidence to suggest that petitioner's jury was confused or divided six to six, petitioner can not prevail on his claim that the instructions improperly misled the jury to believe a majority vote was required to impose a life sentence). ·

### Claim XIII: Unconstitutional Application of the Death Penalty

 At trial, the state argued that Breedlove was guilty of felony murder, having committed a homicide during the course of a burglary (R. 183–90). The

sentencing court found that the underlying felony, which elevated the homicide to first-degree murder, gave rise to an·aggravating circumstance justifying the imposition of a death sentence (R. 185). Breedlove argues that the imposition of a death sentence under these circumstances, where the evidence does not demonstrate that Breedlove committed an intentional or premeditated murder, violates the Eighth Amendment. Breedlove raised this claim on direct appeal, but the Florida Supreme Court rejected his argument.

As his final point, Breedlove makes several attacks on the death sentence; simple felony murder as a basis for the death penalty violates the eighth and fourteenth amendments; improper aggravating circumstances; limited consideration of mitigating circumstances; and death penalty disproportionate in this case.

Breedlove claims that death is an excessive punishment for a simple felony murder, based on Justice White's concurring opinion in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Both the United States Supreme Court and this Court have found that the death penalty is not per se violative of either the federal or state constitution. Breedlove has presented nothing which would compel a different conclusion.

Breedlove states that "this Court has uniformly reversed death sentences in pure felony-murder cases, absent such a finding of an intent to kill" and cites numerous cases in support of this contention. While most of these cases deal with felony murder, all but one concern jury overrides. They are not applicable to the instant case and do not support the point that Breedlove tries to make.

The court found three circumstances in aggravation: previous conviction of violent felony; homicide committed during a burglary; and heinous, atrocious, and cruel. Breedlove argues that an underlying felony cannot be used in ag-

gravation, but presents nothing which compels declaring the felony-murder aggravating circumstance unconstitutional. The trial court properly found the murder to be heinous, atrocious, and cruel. Although death resulted from a single stab wound, there was testimony that the victim suffered considerable pain and did not die immediately. While pain and suffering alone might not make this murder heinous, atrocious, and cruel, the attack occurred while the victim lay asleep in his bed. This is far different from the norm of capital felonies and sets this crime apart from murder committed in, for example, a street, a store, or other public place.

*Breedlove,* 413 So.2d at 9.(footnotes omitted). Not only did the Florida Supreme Court agree with the trial court that the Breedlove's attack on the victim was " heinous, atrocious, and cruel" and "far different from the norm of capital felonies," it specifically rejected Breedlove's claim that the crime was not premeditated. The ample evidence of premeditation presented by the state included Breedlove's arming himself with a butcher knife before entering the bedrooms and the defensive wounds suffered by both victims. *See Breedlove I,* 413 So.2d at 8.

A second point Breedlove argues on this claim is that he is entitled to a new sentencing hearing because the trial judge improperly rejected mitigation evidence presented by the defense and limited the jury's consideration of nonstatutory mitigation. In rejecting this claim, the Florida Supreme Court wrote as follows:

Breedlove also complains that the court limited the range of mitigating circumstances allowed to be considered and that the instructions gave inadequate guidance for consideration and weighing of these circumstances. The instructions, however, were proper and adequate, and the court did not limit presentation of mitigating evidence. Breedlove now claims that the court erred in failing to find the lack of intent to cause death and impaired mental capacity. Finding felony murder in ag-

gravation was proper, and, after acknowledging the conflicting testimony regarding Breedlove's mental capacity, the court chose to find his capacity not impaired or diminished. In the sentencing order the court stated:

[T]his Court, after weighing and considering the aggravating and mitigating circumstances, is of the opinion that no mitigating circumstances, either statutory, or by any testimony, facts or circumstances presented at the advisory proceeding, exist which outweigh the aggravating circumstances.

In the light of properly found aggravating circumstances, with nothing found in mitigation, imposition of the death penalty was proper.

*Breedlove,* 413 So.2d at 9–10 (footnotes omitted).

In this case, the trial court considered, as an aggravating circumstance, the fact that the murder was committed during the course of a felony. As a third point on his thirteenth claim, Breedlove argues that the trial court erred in utilizing the underlying felony as an aggravator because the use of the underlying felony is what rendered this homicide subject to capital punishment. This use of the underlying felony, argues Breedlove, violates the Eighth and Fourteenth Amendments.

***Neelley Analysis.*** The petitioner has not requested an evidentiary hearing. He submits that the clearly established Supreme Court law governing the arguments set forth in this claim include *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859(1976)(Eighth Amendment bars excessive as well as barbaric punishments); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)(a presumption of death violates the Eighth Amendment); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(all mitigation must be considered in assessing propriety of death penalty), and *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)(proscription against improper burden shifting). Breed-

love argues that in rejecting his claims, the Florida Supreme Court unreasonably applied these cases.

In contrast, the state argues that the established Supreme Court law at the time of the direct appeal was *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In *Proffitt*, the Supreme Court held that the imposition of the death penalty was not per se cruel and unusual punishment. It also held that Florida statutory procedures about which Breedlove complains were not unconstitutional. *See also Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(discussing constitutionality of mitigating and aggravating factors).

The petitioner's second contention, concerning the limitation of mitigation evidence, is not persuasive as there was no limitation on the jury's consideration of the mitigating factors to be considered. *See Breedlove I*, 413 So.2d at 9–10.

The petitioner's contentions that the death penalty can not be imposed in a felony murder situation, and that the use of the felony murder aggravator is impermissible, are not supported by any precedent from the United States Supreme Court. Moreover, this argument has been rejected by other courts. *See Bertolotti v. Dugger*, 883 F.2d 1503, 1528 at n. 22 (11th Cir.1989)(jury verdict of felony-murder did not make the death penalty automatic under Florida law, so as to render death penalty unconstitutional, although sentencer found in aggravation the circumstance that defendant murdered in course of robbery); *Adams v. Wainwright*, 709 F.2d 1443, 1446–47 (11th Cir.1983)(rejecting argument that Florida has impermissibly made the death penalty the "automatically preferred sentence" in any felony murder case because one of the statutory aggravating factors is the murder taking place during the course of a felony). The United States Supreme Court has upheld the Florida death penalty statute, including necessarily the use of this statutory aggravating factor. *See Proffitt*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913. As such, in Count XIII, Breedlove has failed to present grounds for the issuance of a writ of habeas corpus.

## IV. CONCLUSION

For the reasons stated, the petition for writ of certiorari is denied.